## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* J. DOUGLAS STRAUSER, STATE OF NEW JERSEY *ex rel.* J. DOUGLAS STRAUSER, STATE OF OKLAHOMA *ex rel.* J. DOUGLAS STRAUSER, and STATE OF TENNESSEE *ex rel.* J.DOUGLAS STRAUSER,<br><br>Plaintiffs,<br><br>v.<br><br>STEPHEN L. LaFRANCE HOLDINGS, INC., STEPHEN L. LaFRANCE PHARMACY, INC., SUPER D DRUGS ACQUISITION CO., DALECO, INC., ARCADIA VALLEY DRUG CO., MAY'S DRUG STORES, INC., ELLISVILLE DRUG ACQUISITION CO., JARCO PHARMACIES, INC., JIM BAIN'S PHARMACY, INC., S & W PHARMACY, INC., CONSOLIDATED STORES, INC., PHARM-MART PHARMACY OF WARREN, INC., STEPHEN L. LaFRANCE, JR., JASON LaFRANCE, and WALGREEN COMPANY, INC.<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>CIVIL ACTION NO.<br>_____<br><br>FILED UNDER SEAL PURSUANT TO 31 U.S.C. ' 3730(b)<br><br>JURY TRIAL REQUESTED |

CIV-13-495-M

**FILED**

MAY 1 4 2013

ROBERT D. DENNIS, CLERK
U.S. DIST. COURT, WESTERN DIST. OF OKLA.
BY_____ DEPUTY

## COMPLAINT
### (False Claims Act)

### SUMMARY STATEMENT

1.  This lawsuit involves hundreds of millions of dollars in false claims submitted to the federal-state Medicaid Programs in Arkansas, Kansas, Mississippi, Missouri, New

Jersey, Oklahoma, and Tennessee by pharmacies, some, but not all of which are set forth in Exhibit A, that were owned and controlled by Defendants Stephen L. LaFrance Holdings, Inc., Stephen L. LaFrance Pharmacy, Inc., Stephen L. LaFrance, Jr., and Jason LaFrance. These pharmacies, many of which did business using the name USA Drug, since the Fall of 2008 have systematically billed Medicaid for generic drugs at prices far in excess of the special savings prices that they usually and customarily charge to cash-paying members of the general public.  They have done so in knowing violation of Medicaid billing rules that require pharmacies to charge Medicaid their "usual and customary charge to the general public."  Moreover, to reduce their risk of Medicaid learning of these overpayments, the pharmacies have hidden from Medicaid the special savings prices that they charge the general public for generic drugs.  For certain generic medications, such as the anti-depressant Fluoxetine, these pharmacies have charged Medicaid prices that have been as much as 38 times the prices charged to the general public, and Medicaid has paid more than five times the amount paid by members of the general public.   Defendant Walgreen Company purchased this pharmacy chain in September 2012. The chain continued to engage in the foregoing wrongful practices in many stores for as long as six additional months after the purchase by Walgreen Company.

2.  *Qui Tam* Plaintiff J. Douglas Strauser ("Strauser" or "Relator") brings this civil action on behalf of and in the name of the United States of America ("United States")

under the *qui tam* provisions of the federal False Claims Act, 31 U.S.C. §§ 3729-3733, and on behalf of and in the name of the state plaintiffs under analogous *qui tam* provisions in state false claims laws.

## JURISDICTION AND VENUE

3.     All Counts of this Complaint are civil actions by Relator, acting on behalf of and in the name of the United States and the state plaintiffs, against the Defendants under the federal False Claims Act, 31 U.S.C. §§ 3729-3733, and analogous state false claims laws.

4.     This Court has jurisdiction over the claims brought on behalf of the United States pursuant to 28 U.S.C. §§ 1331 and 1345, and 31 U.S.C. § 3732(a).

5.     This Court has supplemental jurisdiction over the claims brought on behalf of the state plaintiffs under 28 U.S.C. § 1367.  In addition, the Court has jurisdiction over the state law claims alleged herein under 31 U.S.C. § 3732(b).

6.     Defendant Walgreen Company, Inc. transacts business in this judicial district.  In addition, Defendants Stephen L. LaFrance Holdings, Inc., Stephen L. LaFrance, Jr., and Jason LaFrance have violated the federal False Claims Act in this judicial district as a result of the misconduct alleged herein.  Accordingly, this Court has personal jurisdiction over the Defendants, and venue is appropriate in this district.  The False Claims Act provides that any action under 31 U.S.C. § 3730 may be brought "in any judicial district in which . . . any one defendant can be found, resides, transacts business,

or in which any act proscribed by section 3729 occurred." 31 U.S.C. § 3732(a).  Venue is also proper under 28 U.S.C. § 1391.

7.      None of the allegations set forth in this Complaint is based on a public disclosure of allegations or transactions in a criminal, civil or administrative hearing, in a congressional, administrative or General Accounting Office report, hearing, audit or investigation, or from the news media.  Relator J. Douglas Strauser has direct and independent knowledge of the information on which the allegations set forth in this Complaint are based.  Moreover, prior to filing this lawsuit and prior to any public disclosures regarding this matter, Relator voluntarily provided the information set forth herein to agents of the United States Department of Justice and the state plaintiffs.

**THE PARTIES**

**Relator J. Douglas Strauser**

8.      Strauser, a resident of Sullivan, Missouri, is a licensed pharmacist with a strong interest in public health policy and civic governance.

9.      Strauser obtained his pharmacy license in 1976 after graduating that year from St. Louis College of Pharmacy, St. Louis, Missouri, with a Bachelor of Science in Pharmacy.  At various times throughout the period 1976 to 2008, he owned and operated pharmacies in Sullivan, Missouri, Linn, Missouri, and Steelville, Missouri.   On June 30, 2008, he sold his pharmacy business, known as Meramec Pharmacy, Inc., to Defendant Jarco, Inc. ("Jarco"), an entity under common ownership and control with Defendant

Stephen L. LaFrance Pharmacy, Inc. ("LaFrance Pharmacy").  In 2012, Defendant Jarco

sold its drugstores to Defendant LaFrance Pharmacy, and Defendant Walgreen Company,

Inc. ("Walgreen") purchased Defendant LaFrance Pharmacy.   Strauser works as a part-

time pharmacist at Strauser Drugs, one of the pharmacies he sold to Defendant Jarco.  As

a result of its 2012 acquisition of the stock of Defendant LaFrance Pharmacy, Defendant

Walgreen now controls Strauser Drugs.

10.    Strauser has served his community in a variety of civic positions.   In 1982,

he founded the Sullivan Emergency Assistance Fund, an organization still operating

today, that is designed to offer one-time financial assistance to families in need during a

time of crisis.  Between 1989 and 1992, he served as Alderman, Board President and

Mayor of the City of Sullivan, Missouri.  Subsequently, he served for 13 years as

President of the Board of the local public school district.  Strauser is also a Director of the

Bank of Sullivan.

### Plaintiff United States of America

11.    Relator J. Douglas Strauser brings this action on behalf of the United States

pursuant to the *qui tam* provisions of the federal False Claims Act, 31 U.S.C. § 3729 *et*

*seq.*

12.    The United States of America, acting through the Centers for Medicare and

Medicaid Services ("CMS") of the U.S. Department of Health & Human Services

("HHS"), oversees and reimburses the states for a portion of their expenditures for the

joint federal-state Medicaid program.   Medicaid, a health insurance program for the financially needy, was established under Title XIX of the Social Security Act, 42 U.S.C. §1396 *et seq.*, and state laws.

13.   On behalf of the United States, Relator seeks to recover for damages resulting from false claims submitted to the federal-state Medicaid drug benefit program.

## State Plaintiffs

14.   Relator also brings this action on behalf of the states of New Jersey, Oklahoma and Tennessee ("the state plaintiffs").  He brings this action under the *qui tam* provisions of the following false claims laws of the state plaintiffs:  the New Jersey False Claims Act, N.J. Stat. § 2A:32C-1 *et seq.*; the Oklahoma Medicaid False Claims Act, 63 Okl. St. § 5053 *et seq.*; and the Tennessee Medicaid False Claims Act, Tenn. Code § 71-5-181 *et seq.*

15.   The state plaintiffs participate in the Medicaid program under which, under certain circumstances, they pay the costs of providing pharmaceutical drugs to indigent persons who are the beneficiaries of the program.  The Medicaid program agencies of the state plaintiffs pay pharmacies for medications on behalf of Medicaid beneficiaries.  The state plaintiffs then seek reimbursement for a portion of these expenditures from the federal government.

16.   On behalf of the state plaintiffs, Relator seeks recovery for damages caused by the submission of false claims to state-funded health insurance programs, including but

not limited to the federal-state Medicaid programs that are jointly funded by the United States and the state plaintiffs.

## Defendant Walgreen Company, Inc.

17.    Defendant Walgreen Company, Inc. ("Walgreen") is the leading chain drug store in the country in terms of sales and profits.  As of February 28, 2013, Defendant Walgreen owned and operated approximately over 8,000 drug stores in the United States, including 116 in Oklahoma.  In the fiscal year ending August 31, 2012, Walgreen had sales of $71.6 billion and profits of $2.3 billion.  The company is headquartered in Deerfield, Illinois, and incorporated in Illinois. Walgreen's pharmacies dispense prescription medications in this judicial district as well as in each of the other states named as plaintiffs herein.

18.    On July 5, 2012, Defendant Walgreen announced that it was acquiring the USA Drug pharmacy business, including 144 stores, corporate offices, a distribution center, and a wholesale and brand business, from Stephen L. LaFrance Holdings, Inc. and members of the LaFrance family. Walgreen's press release represented that Walgreen would pay $438 million for the pharmacy chain, subject to adjustments in certain circumstances.  Walgreen's public statement noted that the pharmacy chain it was acquiring recorded sales of $825 million in 2011. The transaction was completed on September 17, 2012.

**Defendant Stephen L. LaFrance Holdings, Inc.**

19.     Defendant Stephen L. LaFrance Holdings, Inc. ("LaFrance Holdings") was founded by Stephen L. LaFrance, Sr., a pharmacist who lives in Pine Bluff, Arkansas.  The company was incorporated in Delaware on July 14, 1997.  Its headquarters are in Little Rock, Arkansas.  From at least 2008 until its stock was purchased by Walgreen, the owner and chairman of the company was Stephen L. LaFrance, Sr., and its officers and directors included Stephen L. LaFrance, Sr., his sons Stephen L. LaFrance, Jr., and Jason LaFrance, and Michael Kerr.

20.     LaFrance Holdings, along with Defendants LaFrance Pharmacy, Inc and Stephen L. LaFrance, Jr. and Jason LaFrance, between 2008 and the Fall of 2012, owned and controlled a group of affiliated, corporate entities ("the LaFrance affiliates") that, in turn, collectively owned a chain of pharmacies that were operated and controlled as a single enterprise, with Joe Courtright as Chief Executive Officer and many of the pharmacies using the "doing business as" name of USA Drug ("the USA Drug pharmacies").  These pharmacies include, but are not limited to, the pharmacies set forth in Exhibit A.  These LaFrance affiliates included companies such as: Defendant LaFrance Pharmacy, Inc., incorporated in Arkansas on June 26, 1972; Daleco, Inc., incorporated in Arkansas on June 4, 2003; Super D Drugs Acquisition Co., incorporated in Delaware on September 11, 1997; Arcadia Valley Drug Co., incorporated in Arkansas on March 28, 2005; May's Drug Store, incorporated in Oklahoma on August 30, 1972; Ellisville Drug Acquisition Co., incorporated

in Arkansas on March 22, 2002; Jim Bain's Pharmacy, Inc., incorporated in Mississippi on June 9, 1986; and Mr. Discount Drugs of South Jackson, Inc., incorporated in Mississippi on November 8, 1977.

21.     The LaFrance affiliates operated under the common management of the officers of LaFrance Holdings and Stephen L. LaFrance Pharmacies, Inc.  Each and every one of these entities had Stephen L. LaFrance, Stephen L. LaFrance, Jr. or Jason LaFrance on its Board of Directors, and all but one of these entities had two out of these three individuals on its Board.  In addition, Joe Courtright, the president of LaFrance Pharmacy, Inc., was also the president or CEO of Super D Drugs Acquisition Co., Jim Bain's Pharmacy, and Mr. Discount Drugs of South Jackson, Inc.  Michael Kerr, the vice president of both LaFrance Holdings and LaFrance Pharmacy, Inc., was also vice president of Super D Drugs Acquisition Co. and May's Drug Store.

22.     The LaFrance affiliates shared the brands USA Drug, Select Brand, Super D Drug, May's Drug, Med-X, and Drug Warehouse, and many of their pharmacies were known as USA Drug pharmacies, often with reference to one of the additional brands as well.  USA Drug was the most common "doing business as" name of the LaFrance affiliates, and Courtright used the title "President and CEO of USA Drug Stores, Inc."

23.     By September 17, 2012, LaFrance Pharmacy, Inc., had consolidated under its ownership most if not all of the LaFrance affiliates, which at the time collectively owned approximately 144 pharmacies in Arkansas, Mississippi, Missouri, New Jersey, Oklahoma,

and Tennessee.   On September 17, 2012, Defendant Walgreen purchased the stock of LaFrance Holdings for $438 million, thereby becoming the owner of Defendant LaFrance Pharmacy.  Walgreen also purchased the assets or stock of certain affiliated entities.   Many of these pharmacies did business under the name of USA Drug, while some of the pharmacies also did business under other names, such as  Super D Drug, May's Drug, Med-X, Drug Warehouse, Strauser Drug and others (these pharmacies are collectively referred to herein as "the USA Drug pharmacies").   When Defendant Walgreen purchased Defendant LaFrance Pharmacy on September 17, 2012, it thereby acquired the USA Drug pharmacy business, a business that generated $825 million in revenue in 2011, according to Walgreen's press release at the time.  In 2010, Walgreen had purchased 17 other pharmacies in the Memphis, Tennessee market that were part of the USA Drug chain of pharmacies.

### Defendant Stephen L. LaFrance Pharmacy, Inc.

24.     Defendant Stephen L. LaFrance Pharmacy, Inc. (or "LaFrance Pharmacy") was incorporated on June 26, 1972 in Pine Bluff, Arkansas, by Stephen L. LaFrance, who continued as Chairman of the Board until the company's purchase by Walgreen.  Between 2008 and September 2012, its officers and directors have included Joe Courtright, Mike Kerr, Stephen L. LaFrance, Jr., and Jason LaFrance.  Between 2008 and 2012, LaFrance Pharmacy did business using the name USA Drug.  LaFrance Pharmacy has formed part of a common enterprise of pharmacy stores owned by members of the LaFrance family and operated under common management.  As a result of Walgreen's purchase of the stock of

Stephen L. LaFrance Holdings, Inc., on September 17, 2012, Walgreen became the owner of LaFrance Pharmacy.  The company's current board of directors and officers include: Mark A. Wagner ("Wagner"), the president of operations at Walgreen; John A. Mann ("Mann"), divisional vice president for tax at Walgreen; Robert M. Silverman ("Silverman"), divisional vice-president of corporate and transactional law at Walgreen; Jason M. Dubinsky ("Dubinsky"), divisional vice president and treasurer at Walgreen; Kermit R. Crawford ("Crawford"), president of pharmacy, health and wellness at Walgreen; and Rick Hans ("Hans"), divisional vice president for investor relations & finance at Walgreen.  After the purchase by Walgreen, Wagner became the president of LaFrance Pharmacy.

## Defendant Super D Drugs Acquisition Co.

25.     Defendant Super D Drugs Acquisition Co. was incorporated on September 11, 1997, in Delaware by Stephen L. LaFrance, who continued as Chairman of the Board until the company's purchase by Walgreen.  Between 2008 and September 2012, its officers and directors have included Joe Courtright, Mike Kerr, Stephen L. LaFrance, Jr., and Jason LaFrance.  Between 2008 and 2012, LaFrance Pharmacy did business using the names of some of the USA Drug pharmacies, including, for example, the pharmacy USA Drug in Malden, Missouri.   Super D. Drugs Acquisition Co. has formed part of a common enterprise of pharmacy stores owned by members of the LaFrance family and operated under common management.  As a result of Walgreen's purchase of the stock of Stephen L. LaFrance Holdings, Inc., on September 17, 2012, Walgreen became the owner of Super D Drugs

Acquisition, Co.  The company's current board of directors and officers include Walgreen's executives Wagner, Mann, Silverman, Dubinsky, Crawford, and Hans.  After the purchase by Walgreen, Wagner became the president of Super D Drugs Acquisition Co.

### Defendant Daleco, Inc.

26.     Defendant Daleco, Inc. was incorporated on June 4, 2003, in Arkansas. Stephen L. LaFrance, Jr. was Chairman of the Board until the company was purchased by Defendant LaFrance Pharmacy shortly before Defendant Walgreen acquired the latter company.  Between 2008 and September 2012, the officers and directors of Daleco, Inc. have included Jason LaFrance and Kelly Barnes.  Between 2008 and 2012, Daleco, Inc., did business using the names of some of the USA Drug pharmacies, including, for example, the pharmacy USA Drug in Farmington, MO.  Defendant Daleco has formed part of a common enterprise of pharmacy stores owned by members of the LaFrance family and operated under common management. As a result of Walgreen's purchase of the stock of Stephen L. LaFrance Holdings, Inc., on September 17, 2012, Walgreen became the owner of the drug stores previously owned by Daleco, Inc.

### Defendant Arcadia Valley Drug Co.

27.     Defendant Arcadia Valley Drug Co. was incorporated as AV Drug Acquisition Co. on February 24, 2005 in Arkansas by Stephen L. LaFrance, Jr., who continued as Chairman of the Board until the company was purchased by Defendant LaFrance Pharmacy shortly before Defendant Walgreen acquired the latter company.  AV Drug Acquisition

Co.'s name was changed to Arcadia Valley Drug Co. on May 11, 2005. Between 2008 and September 2012, the company's officers and directors have included Jason LaFrance and Kelly Barnes. Between 2008 and 2011, Arcadia Valley Drug Co. did business using the names of some of the USA Drug pharmacies including, for example, the pharmacy USA Drug in Ironton, MO. This company has formed part of a common enterprise of pharmacy stores owned by members of the LaFrance family and operated under common management. As a result of Walgreen's purchase of the stock of Stephen L. LaFrance Holdings, Inc., on September 17, 2012, Walgreen became the owner of the drug stores previously owned by Arcadia Valley Drug Co.

### Defendant May's Drug Stores, Inc.

28.     Defendant May's Drug Stores, Inc., an owner of one or more pharmacies, was incorporated in the State of Oklahoma on August 21, 1972. It was purchased by defendant LaFrance Pharmacy, Inc. in 2004. Its directors and officers have included Stephen L. LaFrance, Stephen L. LaFrance, Jr., Jason LaFrance, Joe Courtright, and Michael Kerr. The company has done business using the name USA Drug and May's Drug. This company has formed part of a common enterprise of pharmacy stores owned by members of the LaFrance family and operated under common management. As a result of Walgreen's purchase of the stock of Stephen L. LaFrance Holdings, Inc., on September 17, 2012, Walgreen became the owner of May's Drug Stores, Inc. The company's current board of directors and officers include Walgreen's executives Wagner, Mann, Silverman, Dubinsky, Crawford, and Hans.

## Defendant Ellisville Drug Acquisition Co.

29.    Defendant Ellisville Drug Acquisition Co., an owner of one or more pharmacies, was incorporated in the State of Arkansas on February 22, 2002.  Its directors and officers have included Stephen L. LaFrance, Jr., and Jason LaFrance.  The company has formed part of a common enterprise of pharmacy stores owned by members of the LaFrance family and operated under common management.  As a result of Walgreen's purchase of the stock of Stephen L. LaFrance Holdings, Inc., on September 17, 2012, Walgreen became the owner of the drug stores previously owned by Ellisville Drug Acquisition Co.

## Defendant Jarco Pharmacies, Inc.

30.    Defendant Jarco Pharmacies, Inc. was incorporated on March 28, 2008 in Arkansas by Stephen L. LaFrance, who was Chairman of the Board until the company was purchased by Defendant LaFrance Pharmacy shortly before Defendant Walgreen acquired the latter company.  Between 2008 and September 2012, its officers and directors have included Stephen L. LaFrance, Jr., and Jason LaFrance.  Between 2008 and 2010, Jarco Pharmacies, Inc., did business using the names of some of the USA Drug pharmacies, including the name Strauser Drugs, in Sullivan, Missouri. This company has formed part of a common enterprise of pharmacy stores owned by members of the LaFrance family and operated under common management.  As a result of Walgreen's purchase of the stock of

Stephen L. LaFrance Holdings, Inc., on September 17, 2012, Walgreen became the owner of the drug stores previously owned by Jarco Pharmacies, Inc.

### Defendant Jim Bain's Pharmacy, Inc.

31.     Defendant Jim Bain's Pharmacy Inc., an owner of one or more pharmacies, was incorporated in the State of Mississippi on June 9, 1986.  It was purchased by defendant LaFrance Pharmacy in 2008.  Its directors and officers have included Stephen L. LaFrance, Stephen L. LaFrance, Jr., Jason LaFrance, Joe Courtright, and Michael Kerr. This company has formed part of a common enterprise of pharmacy stores owned by members of the LaFrance family and operated under common management.  As a result of Walgreen's purchase of the stock of Stephen L. LaFrance Holdings, Inc., on September 17, 2012, Walgreen became the owner of the drug stores previously owned by Jim Bain's Pharmacy, Inc.  The company's current board of directors and officers include Walgreen's executives Wagner, Mann, Silverman, Dubinsky, Crawford, and Hans.

### Defendant S & W Pharmacy, Inc.

32.     Defendant S & W Pharmacy, Inc., an owner of one or more pharmacies, was incorporated in the State of Arkansas on September 10, 1970.  Its directors and officers have included Stephen L. LaFrance. The company has done business using the name USA Drug.  This company has formed part of a common enterprise of pharmacy stores owned by members of the LaFrance family and operated under common management.  As a result of Walgreen's purchase of the stock of Stephen L. LaFrance Holdings, Inc., on September 17,

2012, Walgreen became the owner of the drug stores previously owned by S & W Pharmacy, Inc.

### Defendant Pharm-Mart Pharmacy of Warren, Inc.

33.     Defendant Pharm-Mart Pharmacy of Warren, Inc., an owner of one or more pharmacies, was incorporated in the State of Arkansas on April 4, 1972.  Its directors and officers have included Stephen L. LaFrance and Stephen L. LaFrance, Jr.  The company has done business using the name USA Drug.  This company has formed part of a common enterprise of pharmacy stores owned by members of the LaFrance family and operated under common management.  As a result of Walgreen's purchase of the stock of Stephen L. LaFrance Holdings, Inc., on September 17, 2012, Walgreen became the owner of the drug stores previously owned by Pharm-Mart Pharmacy of Warren, Inc.

### Defendant Consolidated Stores, Inc.

34.     Defendant Consolidated Stores, Inc., an owner of one or more pharmacies, was incorporated in the State of Arkansas on June 21, 1985.  Its directors and officers have included Stephen L. LaFrance. The company has done business using the name USA Drug. This company has formed part of a common enterprise of pharmacy stores owned by members of the LaFrance family and operated under common management.  As a result of Walgreen's purchase of the stock of Stephen L. LaFrance Holdings, Inc., on September 17, 2012, Walgreen became the owner of the drug stores previously owned by Consolidated Stores, Inc.

### Defendant Stephen L. LaFrance, Jr.

35.     Through September 2008, Stephen L. LaFrance, Jr., the son of Stephen L. LaFrance, was the secretary of Defendant Stephen L. LaFrance Holdings, Inc., as well as a member of the board of directors of the following companies which owned pharmacies doing business under the USA Drug name:  LaFrance Pharmacy; Jarco Pharmacies, Inc.; Daleco, Inc.; Super D Drugs Acquisition Co.; and Jim Bain's Pharmacy, Inc.  He was also the president of the following companies: Jarco Pharmacies, Inc.; Daleco, Inc.; Ellisville Drug Acquisition Co.; and Arcadia Valley Drug Co.  The foregoing entities were operated as a single enterprise – USA Drug -- under the executive control of Joe Courtright, Chief Executive Officer.  Stephen L. LaFrance, Jr., is a resident of Little Rock, Arkansas.   (The name "USA Drug" is used herein to refer to this single enterprise.)

### Defendant Jason LaFrance

36.     Through September 2008, Jason LaFrance, the son of  Stephen L. LaFrance, was executive vice president at Stephen L. LaFrance Holdings, Inc., as well as a member of the board of directors at the following companies which owned pharmacies doing business under the USA Drug name:  LaFrance Pharmacy; Jarco Pharmacies, Inc.; Super D Drugs Acquisition Co.; Arcadia Valley Drug Co.; May's Drug Store; Ellisville Drug Acquisition Co.; Jim Bain's Pharmacy, Inc.; and Mr. Discount Drugs of South Jackson, Inc.  He was also the vice president of Jarco Pharmacies, Inc., Arcadia Valley Drug Co., Jim Bain's Pharmacy, Inc., and Mr. Discount Drugs of South Jackson, Inc.  The foregoing entities were operated as

a single enterprise – USA Drugs -- under the executive control of Joe Courtright, Chief Executive Officer.    Jason LaFrance is a resident of Little Rock, Arkansas.

### MEDICAID BILLING REQUIREMENT:
### "USUAL AND CUSTOMARY CHARGE TO THE GENERAL PUBLIC"

37.    As a condition of a state's obtaining federal reimbursement for a portion of the state's Medicaid expenditures, the federal government requires each state to comply with a number of specific requirements that are set forth in federal regulations.  One of these federal requirements relates to the appropriate reimbursement for pharmaceutical drugs.  The federal government will not reimburse a state for its Medicaid expenditures for prescription drugs unless the state complies with certain payment limits.  To get federal reimbursement, the state must pay no more than the lowest of three separate rates, one of which is the dispensing pharmacy's "usual and customary charge to the general public" for the drug.  42 C.F.R. § 447.332(b).

38.    To comply with the federal regulation described in the preceding paragraph, state Medicaid programs have enacted rules that require pharmacies to bill Medicaid no more than their "usual and customary charge to the general public" for prescription drugs. The states have enacted these rules in statutes, regulations, and/or manuals that set forth instructions for pharmacies billing Medicaid.  The states require providers, including pharmacies, that bill Medicaid to certify that they will comply and are in compliance with Medicaid program rules and instructions.

39.     The states that participate in Medicaid reference, and in some cases define, the term "usual and customary charge to the general public" (hereinafter referred to as the "usual and customary charge" or "U&C charge") in statutes, rules, and/or program manuals, so that pharmacies can understand how to compute their charges to Medicaid. The Medicaid Program of each state requires pharmacies to bill Medicaid the price that the pharmacy usually and customarily makes available to members of the general public, including any discounted, promotional or savings-discount prices.

## Arkansas

40.     Under the rules governing the Medicaid program of the State of Arkansas, Medicaid  pays participating pharmacies "the lower of: (1) The pharmacist's usual and customary charge to the general public for the drug; or (2) The pharmacist's cost of the drug plus a dispensing fee." A.C.A. § 20-77-403 (2012).

41.     Pharmacies participating in Arkansas' Medicaid Program must bill Medicaid an amount "consistent with the pharmacy's usual and customary charge to the general public," a term that Arkansas Medicaid defines as "the price that is charged for 90% of the prescriptions for private pay customers for the same product and quantity." Pharmacy Medicaid Provider Manual, § II, subsection 251.100 (October 13, 2003) (accessible at https://www.medicaid.state.ar.us/InternetSolution/Provider/docs/pharmacy.aspx#manual).

42.     In Arkansas, "Medicaid Stores may choose the pricing method they desire, and must apply the same pricing formula to prescriptions filed with the Arkansas

Medicaid Program that is applied to prescriptions for private pay customers." In Arkansas, "Medicaid reimbursement will be based upon the submitted usual and customary billed amount and will be subject to audit verification of the usual and customary price. Stores found in violation of the usual and customary billing provisions will be subject to recoupment of any identified overpayment." Pharmacy Medicaid Provider Manual, Section II, subsection 251.100 (October 13, 2003) (accessible at https://www.medicaid.state.ar.us/InternetSolution/Provider/docs/pharmacy.aspx#manual).

43. In particular, under the rules of the Arkansas Medicaid Program, "[d]iscrimination against Medicaid beneficiaries is prohibited. No Medicaid beneficiary shall be excluded from any temporary or promotional discount or price reduction available to persons who are not Medicaid beneficiaries. . . . Amounts billed to the Medicaid Program must be adjusted to reflect temporary or promotional discounts or price reductions irrespective of coupon or card presentation. If it is determined, by audit or otherwise, that one or more Medicaid beneficiaries was excluded from any temporary or promotional discount or price reduction, the difference between the reduced or discounted price and the price paid will be recouped from the Medicaid provider." Pharmacy Medicaid Provider Manual, Section II, subsection 251.101 (September 1, 2005) (accessible at https://www.medicaid.state.ar.us/InternetSolution/Provider/docs/pharmacy. aspx#manual).

**Kansas**

44.     Pursuant to the rules of the State of Kansas' Medicaid program, "[i]n no case shall reimbursement for a prescription exceed the lesser of the provider's usual and customary charge for that prescription or the state allowable for that prescription.  The submitted charge and payment for covered over-the-counter pharmacy products shall not exceed the lesser of the product acquisition cost plus the dispensing fee or the usual and customary over-the-counter charge of the pharmacy provider."  K.A.R. § 30-5-94 (2013).

**Mississippi**

45.     The rules of the State of Mississippi's Department of Medicaid (DOM) provide that pharmacy "[c]laims must be billed at the usual and customary charge.  DOM does not reimburse claims at more than the usual and customary charge."  Provider Policy Manual, Section: Pharmacy, Section 31.04 (May 1, 2008), p. 2 (accessible at http://www.medicaid.ms.gov/Manuals/Section%2031%20-%20Pharmacy/Section%2031.04%20-20Reimbursement.pdf).

46.     Mississippi Medicaid defines the term "usual and customary charge" as the price charged to "the patient group accounting for the largest number of non-Medicaid prescriptions from the individual pharmacy," excluding patients who purchase or receive their prescriptions through a third party payer (ex: Blue Cross and Blue Shield, Aetna, etc.)."  *Id.*

## Missouri

47.     Missouri's Medicaid rules provide that providers may not bill, and Medicaid will not reimburse, "in excess of the provider's usual and customary charge for a particular service."   MO HealthNet Provider Manuals, Pharmacy, Section 12: Reimbursement   Methodology   (Production   -   09/6/2012)   (accessible   at http://manuals.momed.com/manuals/hyperlinkPage. render?idLink ParmName=pha#).

## New Jersey

48.     The Medicaid rules of the State of New Jersey provide that "[t]he maximum charge to the New Jersey Medicaid or NJ FamilyCare program for drugs, including the charge for the cost of medication and the dispensing fee, shall not exceed the provider's usual and customary and/or posted or advertised charge."  N.J.A.C. 10:51-1.5(c) (2012).

49.     New Jersey Medicaid further specifies that: "[t]he provider shall not charge the programs more than would be charged to a cash customer when the general public, including private third party plans, accounts for more than 50 percent of a provider's total prescription volume." N.J.A.C. 10:51-1.10(b)(1) (2012).

## Oklahoma

50.     The Medicaid Program of the State of Oklahoma ("Sooner Care") requires pharmacies seeking payment to state their "usual and customary to the general public" on submitted claims. Oklahoma Administrative Code § 317:30-5-78(e).  Oklahoma Medicaid

will reimburse no more than the pharmacy's "usual and customary charge to the general public." Oklahoma Administrative Code § 317:30-5-78(d).

51.     Oklahoma Medicaid defines the term "usual and customary charge to the general public" to be the pharmacy's usual and customary charge to "the patient group accounting for the largest number of non-SoonerCare prescriptions from the individual pharmacy," excluding "patients who purchase or receive their prescriptions through other third-party payers." *Id.* A pharmacy billing Medicaid must provide Medicaid with any discounted prices it makes available to the general public when the "patients receiving the favorable prices represent more than 50% of the pharmacy's prescription volume." *Id.*

### Tennessee

52.     The State of Tennessee's Managed Medicaid Program ("TennCare") requires providers to bill and TennCare to pay no more than "usual and customary." TennCare Pharmacy Manual, Version 4.0 (February 2013), p. 39 (accessible at https://tnm.providerportal.sxc.com/rxclaim/TNM/ TennCarePharmacyManual.pdf).   The TennCare Payer Specification Sheet requires that pharmacy providers input their "usual and customary" charge when submitting claims. *Id.* at p. 45. Effective January 1, 2006, the TennCare provider participation agreement for ambulatory and long-term care pharmacy providers stated that TennCare would not pay more than the "usual and customary charge to the general public." TennCare Pharmacy Agreement, Section 3.1 (accessible at http://www.tn.gov/tenncare/forms/phar20060104.pdf).   The agreement

defined "customary charge" as "[t]he reasonable, usual and customary fees charged by Pharmacy which do not exceed the fees Pharmacy would charge any other person regardless of whether the person is a TennCare enrollee."  TennCare Pharmacy Agreement, Section 2.1.

## THE FRAUDULENT SCHEME

### The False Claims Submitted to Medicaid

53.     In or about 2008, Defendants Stephen L. LaFrance, Jr., Jason LaFrance, and the Defendant LaFrance affiliates that they controlled and operated as a single enterprise that did business as "USA Drug" (the LaFrance Defendants and the LaFrance affiliates are collectively referred to hereinafter as "USA Drug"), began requiring the USA Drug pharmacies to offer hundreds of generic medications to customers paying with cash rather than insurance at $4 for a 30-day supply and $10 for a 90-day supply (these practices collectively will be referred to herein as "$4 generic pricing").  The Defendants did this to meet competition from Wal-Mart Stores, Inc. ("WalMart").  In the third quarter of calendar year 2006, WalMart's pharmacies throughout the nation had launched a program that provided customers with $4 pricing for a 30-day supply of any one of more than 300 commonly-prescribed generic medications.  In conversations with a WalMart pharmacy manager at the time of the implementation of the $4 pricing program, Relator asked if WalMart would be charging Medicaid and other third-party programs the same $4 pricing for the medications included in the program. The pharmacy manager for WalMart replied

WalMart would be charging the $4 price, which it did and continues to do in compliance with Medicaid's Usual and Customary charge requirement. In subsequent years, WalMart expanded the program so that it also offered customers $10 pricing for a 90-day supply of many of these generic medications. WalMart made these same low prices available to Medicaid, charging Medicaid beneficiaries as well as cash-paying customers $4 for a 30 day supply and $10 for a 90 day of the medications that were part of its program. Exhibit B contains copies of WalMart brochures dated October 17, 2006, January 17, 2007, March 24, 2009, January 13, 2010, June 25, 2010, June 30, 2011, March 2, 2012, and April 4, 2013, that list the several hundred medications that WalMart's pharmacies have included in their $4 generic pricing program between 2006 and the present time. (These brochures are collectively referred to herein at "the WalMart list.") The Defendants matched the pricing of the Wal-Mart program, but only for cash-paying customers. They did not make these low prices available to Medicaid beneficiaries, in contrast to WalMart and some of the other retail pharmacy chains. From the fall of 2008 through at least September 2012, the Defendants have offered cash-paying customers $4 pricing for a 30-day supply, and $10 day pricing for a 90-day supply, on the same generic medications as listed in the Wal-Mart list in effect at the time.

54.     At some USA Drug pharmacies, including Relator's former pharmacies in Linn, Missouri and Sullivan, Missouri, the company rolled out the $4 generic pricing by

offering it to any cash-paying customer who brought a receipt from another pharmacy showing that they had been offered $4 generic pricing at the other store.

55.     USA Drug soon abandoned that approach, however, as management concluded it didn't make sense to invite customers to shop elsewhere first. Instead, by the fall of 2008, USA Drug's management began requiring all of the USA Drug pharmacies to offer the $4 generic pricing to any cash-paying customer who requested it, without requiring enrollment in a program or payment of any type of fee. Once a customer had requested this pricing for a particular prescription, the pharmacy staff generally made a note in the patient's file to ensure that the customer received the $4 generic pricing on all eligible generic drug prescriptions from that point forward.

56.     USA Drug marketed its $4 generic pricing by notifying physicians' offices that USA Drug pharmacies offered this pricing. To get the word out beyond doctors and their patients, the company relied on pharmacy staff and communications amongst the pharmacies' customers.

57.     For almost all medications on the WalMart list, by USA Drug's 2009-2010 fiscal year (July 1, 2009-June 30, 2010), a majority of USA Drug's transactions with non-insured patients were made at $4 generic pricing. Indeed, for many of these drugs, by this point in time, more than 90% of USA Drug's transactions with non-insured customers were made at $4 generic pricing. During the next two fiscal years, even larger

percentages of USA Drug's transactions with cash paying customers for these medications were made at $4 generic pricing.

58.    The following chart reflects all USA Drug transactions with non-insured customers and Medicaid for several popular generic drugs at the Strauser Drugs store during the USA Drug fiscal year July 1, 2009 through June 30, 2010:

| Drug | # Cash Pay Transactions | % Cash Pay Transactions at $4 or Below | Amounts Charged Medicaid |
|------|------------------------|----------------------------------------|--------------------------|
| 20 Ciprofloxacin 500MG tablets | 17 | 76.5% | $121.95, $117.59, $113.74, $82.41, $19.43 |
| 30 Fluoxetine 40MG capsules | 25 | 76.0% | $172.24 |
| 30 Fluoxetine 20MG capsules | 30 | 93.3% | $88.52 |
| 30 Furosemide 20MG tablets | 10 | 90.0% | $9.99, $9.89 |
| 30 Furosemide 40MG tablets | 25 | 80.0% | $10.26, $10.69 |
| 30 Loratadine 10MG tablets | 206 | 62.1% | $31.60, $23.69, $18.24 |
| 30 Loratadine 10MG tablets | 216 | 99.1% | $31.60, $14.92, $14.24 |
| 30 Metoprolol 50MG tablets | 11 | 81.8% | $22.59 |

| Drug | # Cash Pay Transactions | % Cash Pay Transactions at $4 or Below | Amounts Charged Medicaid |
|---|---|---|---|
| 30 Ranitidine 150MG tablets | 14 | 85.7% | $56.46 |
| 30 Ranitidine 300MG tablets | 21 | 85.7% | $90.21, $90.05, $90.59 |
| 60 Metformin 500MG ER tablets | 12 | 100.0% | $52.24 |
| 60 Metoprolol 50MG tablets | 57 | 86.0% | $39.71 |
| 60 Naproxen 500MG tablets | 13 | 84.6% | $77.31, $78.05 |
| 60 Ranitidine 150MG tablets | 69 | 91.3% | $107.99, $107.18 |

59.    Throughout the period between the Fall of 2008 and Walgreen's September 2012 purchase of USA Drug, USA Drug management supplied the USA Drug pharmacies with a billing software program developed by Computer Rx of Oklahoma City, Oklahoma.  USA Drug's corporate headquarters inputted parameters into this program that established a single price for every drug that management characterized as the "Usual & Customary price."  This price was determined by corporate headquarters based on their assessment as to what amount would always equal or exceed the maximum possible reimbursement for the drug from government payers such as Medicaid and third-party

payers. USA Drug's corporate headquarters instructed the pharmacies that they should override this pricing with $4 generic pricing for all cash-paying customers requesting the $4 pricing.

60.     To facilitate the ability of its pharmacists to override retail pricing with $4 generic pricing for cash-paying customers, USA Drug's corporate management regularly input into the billing software WalMart's current list of generic medications with $4 generic pricing. Whenever pharmacy staff accessed the screen in the billing software that provided information on USA Drug's price for a generic drug product -- a screen called the "Prescription Quote" screen -- the billing software would inform the pharmacist or technician if the generic drug was on the WalMart $4 generic pricing list. Pursuant to USA Drug policy, if a generic drug was on the WalMart list, the pharmacist was then supposed to manually override the retail price that automatically appeared in the price field in the billing software with the much lower $4 generic price. While this manual override practice was cumbersome, over time, USA Drug's pharmacists became adept at routinely carrying out the override when selling generic drugs on the WalMart list to cash paying customers. Some pharmacies kept a paper copy of the WalMart list handy so they could readily determine whether any given generic drug was on the list.

61.     In compliance with directions from management, Relator, when he was a pharmacist employed by USA Drug, offered $4 generic pricing to non-insured customers at the stores in Linn, Missouri, and Sullivan, Missouri, that he had previously owned. He

repeatedly, however, expressed to USA Drug management his concern that USA Drug's failure to offer the $4 generic pricing to Medicaid would expose the company to potential liability if the company's pharmacies were to be audited.

62.    Relator further noted to management that USA Drug also could face significant liability if it charged non-government, third-party insurers such as pharmacy benefit managers (PBMs) more than $4 generic pricing on days on which it offered the same medication to cash paying customers at $4 generic pricing.

63.    At the direction of USA Drug, Relator's former pharmacies in Linn, Missouri, and Sullivan, Missouri, as well as the other USA Drug stores, continued to offer $4 generic pricing through the date of the acquisition by Walgreen.

64.    After Walgreen acquired ownership and control of LaFrance Pharmacy and certain of the LaFrance affiliates in September 2012, Walgreen allowed the USA Drug pharmacies for a period of time to continue to utilize $4 generic pricing for cash-paying customers without making this pricing available to Medicaid. Through its ownership and control of LaFrance Pharmacy and certain of the LaFrance affiliates, Walgreen also caused LaFrance Pharmacy and these LaFrance affiliates to unlawfully retain the overpayments the USA Drug pharmacies had received from Medicaid in the past as a result of their failure to offer Medicaid $4 generic pricing.  These overpayments were identified by and known to all of the Defendants.  Walgreen's management directed the USA Drug stores that they would have to discontinue the $4 generic pricing for cash

customers when the pharmacies' computer systems were converted to new systems used by Walgreen's stores. In the Strauser Drugs pharmacy, on March 20, 2013, Relator advised Pam Marshall, a Walgreen Pharmacy Supervisor who oversees numerous stores, that the $4 prescription plan, as implemented by USA Drug and continued by Walgreen, was illegal. Relator told her he would be glad to see it end.

65.     On April 5 and 6, 2013, representatives of USA Drug stores in Arkansas, Mississippi, Oklahoma, Tennessee, confirmed to Relator that these USA Drug stores likewise continued their $4 generic pricing through their acquisition by Walgreen, with each store either terminating this pricing soon after the Walgreen acquisition or planning to do so in the near future once Walgreen took over store operations.   Thus:

- On April 5, 2013, at 6:55 p.m. C.D.T., Relator spoke with "Stan," a pharmacy technician at Drug Warehouse, at 591 S. Mill Street, Pryor, Oklahoma 74361. Stan informed Relator that his drugstore would continue the $4 generic pricing for two more weeks, until Walgreen took over store operations.

- On April 6, 2013, at 8:58 a.m. C.D.T., Relator spoke with "Lita," a pharmacy technician at USA Drug – USA Drug Express, at 1919 W. Main Street, Ashdown, Arkansas, 71822. Lita informed Relator that her store participates in the $4 generic pricing match with Wal-Mart, but that it would end on May 9, 2013, when Walgreen took over.

- On April 6, 2013, at 9:02 a.m. C.D.T., Relator spoke with a pharmacy technician at USA Drug – Super D Drugs, at 6068 S. First Street, Milan, Tennessee. 38358.  The technician informed Relator that her store had participated in the $4 generic pricing match with Wal-Mart through Walgreen's purchase of USA Drug, but that it no longer did so. She said her store had just recently stopped offering $4 generic pricing.

- On April 6, 2013, at 9:05 a.m. C.D.T., Relator spoke with "Brianna," a pharmacy technician at USA Drug – Super D Drugs, at 200 Marion Avenue, McComb, Mississippi, 39648.  Brianna informed Relator that her store ceased offering $4 generic pricing about a month ago.

66.    The USA Drug pharmacies ordinarily did not advertise the $4 generic pricing in the media or use brochures, signs, or other promotional material to advertise the $4 generic pricing within their stores.

67.    USA Drug pharmacies misrepresented their "usual and customary charge to the general public" when submitting invoices for generic medications on the WalMart list to Medicaid.  When submitting such invoices, even when specifically asked by Medicaid to state on claims forms their "usual and customary charge" to the general public, the USA Drug pharmacies did not disclose the $4 pricing.   On the contrary, USA Drug's pharmacies routinely falsely informed Medicaid that their "usual and customary charge" for these drugs was the rate set by corporate management for all third-party sales – a rate

that was rarely, if ever, actually charged to cash-paying customers or paid by non-government third parties, and that almost always significantly exceeded the $4 generic pricing given to cash-paying customers.  The pharmacies made this misrepresentation in order to obtain payment at higher levels than that to which they were entitled.  Similarly, in violation of Medicaid billing rules, USA Drug's pharmacies routinely charged Medicaid amounts for generic drugs on the WalMart list that exceeded the pharmacies' "usual and customary charge to the general public" in order to obtain payment at higher levels than that to which they were entitled.

**Specific Examples of Knowing, False Claims**

68.     The following are examples of instances in which USA Drug overcharged Medicaid by billing in violation of the usual and customary charge billing rule:

- During the month of January 2012, USA Drug's pharmacy Strauser Drugs in Sullivan, Missouri, entered into the following transactions involving 30 capsules of the antibiotic Amoxicillin 500 mg:

  o    Eleven sales to cash-paying customers, with US Drug charging each and every such customer $4 and accepting $4 in reimbursement. These 11 transactions took place on January 3, 2012 (two transactions), January 5, 2012 (one transaction), January 6, 2012 (one transaction), January 9, 2012 (one transaction), January 10, 2012 (one transaction), January 12, 2012 (one transaction), January 13, 2012

(one transaction), January 17, 2012 (one transaction), January 19, 2012 (one transaction), and January 26, 2012 (one transaction).

o      Seven sales to customers covered by private health insurance in which USA Drug accepted as full reimbursement the following amounts:  $10.08, $10.00 (in two instances), $8.00, $7.15, $6.04, and $5.39.   These seven transactions took place on January 3, 5, 10, 11, and 18, 2012, respectively.

o      Two sales to Medicare Part D-Pacificare beneficiaries, on January 3 and 24, 2012, in which USA Drug charged $21.05 and $15.49, respectively, and obtained $5.10 in total reimbursement in each instance.

o      One sale to Medicare Part D Missouri-Senior Rx, the Missouri Medicaid program that pays as secondary payer when a beneficiary has primary coverage from Medicare Part D, on January 3, 2012, in which USA Drug charged $15.49 and was reimbursed $7.65 in full. (Although Mo-Senior Rx was renamed "MoRx" in 2006, USA Drug's billing software continued to use the program's prior name, "Mo Senior Rx.")

o      Five sales to Missouri Medicaid beneficiaries, in which USA Drug charged $21.05 and was reimbursed $17.24 or $17.74 in each

such instance.  These transactions took place on January 2, 2012 (one transaction), January 3, 2012 (two transactions), January 14, 2012 (one transaction) and January 17, 2012 (two transactions).

- During the month of January 2012, USA Drug's pharmacy Strauser Drugs in Sullivan, Missouri, entered into the following transactions involving 30 tablets of Cyclobenzaprine 10 mg. ( a muscle relaxant):

  o   Five sales to cash-paying customers, with USA Drug charging four of these customers $4 and accepting $4 in reimbursement, and charging the remaining customer $18.34 and accepting that amount in reimbursement.   These five transactions took place on January 6, 2012, January 9, 2012, January 10, 2012, January 11, 2012, and January 27, 2012.

  o   Fourteen sales to customers covered by private health insurance in which USA Drug accepted as full reimbursement the following amounts:  $3.22 (three times), $3.42 (two times),  $4.56 (one time), $5.00 (one time), $5.39 (one time), $5.45 (two times), $6.66 (one time),   $7.46 (one time), and $10.00 (two times).   These 14 transactions took place on January 6 (one transaction), 7 (one transaction), 9 (one transaction), 10 (one transaction), 14 (one

transaction), 18 (two transactions), 23 (three transactions), 25 (one
transaction), and 27 (three transactions), 2012, respectively.

o      Two sales to Medicare Part D Missouri-Senior RX (MoRX
Plan), on January 16 and 31, 2012, in which USA Drug charged
$38.83 and was reimbursed in full $5.25 (on January 16) and $4.92
(on January 31).

o      Nine sales to Missouri Medicaid beneficiaries, in which USA
Drug charged $38.83 and was reimbursed $15.18 in each such
instance.  These transactions took place on January 5, 9, 10, 11, 14,
18, 25, 30 and 31.

69.    The following are additional examples drawn from Strauser Drugs'
transactions during January 2012 that again illustrate the Defendants' pervasive
overbilling of Medicaid for generic drugs:

- During the month of January 2012, Strauser Drugs on a total of 10
  occasions sold a 30-day supply of the antidepressant Citalopram 40 mg to
  a customer paying with cash rather than insurance.   On each such
  occasion, Strauser Drugs charged and accepted as payment $4.  During
  the same month, Strauser Drugs billed Missouri Medicaid 13 times and
  Medicare Part D Missouri Senior Rx (MoRX Plan) 14 times for a 30-day
  supply of Citalopram 40 mg., each time charging $79.64 and receiving as

payment either $15.57 or $16.53 from Missouri Medicaid, or an amount that ranged between $4.44 and $9.25 from Medicare Part D Missouri Senior Rx (MoRX Plan).

- During the month of January 2012, Strauser Drugs on a total of four occasions sold a 30-day supply of the anti-cholesterol drug Lovastatin 20 mg to a customer paying with cash rather than insurance.  On each such occasion, Strauser Drugs charged and accepted as payment $4.  During the same month, Strauser Drugs billed Missouri Medicaid two times, and Medicare Part D Missouri Senior Rx (MoRX Plan) three times, for a 30-day supply of Lovastatin 20 mg., each time charging $72.87 and receiving as payment $17.34 from Missouri Medicaid, and $6.43, $8.88 or $15.91 from Medicare Part D Missouri Senior Rx (MoRX Plan).

- During the month of January 2012, Strauser Drugs on a total of seven occasions sold a 30-day supply of the anti-cholesterol drug Pravastatin 20 mg to a customer paying with cash rather than insurance.  On each such occasion, Strauser Drugs charged and accepted as payment $4.  During the same month, Strauser Drugs billed Missouri Medicaid five times and Medicare Part D Missouri Senior Rx (MoRX Plan) two times for a 30-day supply of Pravastatin 20 mg., each time charging $97.34 and

receiving as payment $16.67 from Missouri Medicaid, or $9.60 or $12.17 from Medicare Part D Missouri Senior Rx (MoRX Plan).

- During the month of January 2012, Strauser Drug on a total of three occasions sold a 30-day supply of the anti-depressant drug Fluoxetine 40 mg to a customer paying with cash rather than insurance.  On each such occasion, Strauser Drugs charged and accepted as payment $4.  During the same month, Strauser Drugs billed Missouri Medicaid four times and Medicare Part D Missouri Senior Rx (MoRX Plan) five times for a 30-day supply of Fluoxetine 40 mg., each time charging $154.96 and receiving as payment $16.67 from Missouri Medicaid, and amounts between $10.36 and $25.92 from Medicare Part D Missouri Senior Rx (MoRX Plan).

- During the month of January 2012, Strauser Drug on a total of eight occasions sold a 30-day supply of the thyroid hormone supplement Levothyroxine 75 mg to a customer paying with cash rather than insurance.  On each such occasion, Strauser Drugs charged and accepted as payment $4.  During the same month, Strauser Drug billed Missouri Medicaid 10 times for a 30-day supply of Levothyroxine 75 mg., each time charging $17.16 and receiving as payment $14.18.

- During the month of January 2012, Strauser Drug, on a total of 14 occasions sold a 30-day supply of the blood pressure medication Lisinopril 10 mg to a customer paying with cash rather than insurance. On each such occasion, Strauser Drugs charged and accepted as payment $4.  During the same month, Strauser Drugs billed Missouri Medicaid nine times for a 30-day supply of Lisinopril 10 mg, each time charging $36.48 and receiving as payment $14.51 from Missouri Medicaid.

- During the month of January 2012, Strauser Drug on a total of 10 occasions sold a 30-day supply of the diabetes drug Metformin 1000 mg to a customer paying with cash rather than insurance.  On each such occasion, Strauser Drugs charged and accepted as payment $4.  During the same month, Strauser Drugs billed Missouri Medicaid four times and Medicare Part D Missouri Senior Rx (MoRX Plan) 13 times for a 30-day supply of Metformin 1000 mg.  Each time the pharmacy billed Medicaid, it charged $86.10 and was reimbursed either $13.72 or $16.90.  When the pharmacy billed Medicare Part D Missouri Senior Rx (MoRX Plan), in 11 of the 13 instances, it billed $86.10 and was reimbursed amounts between $4.20 and $13.75.  In the remaining two instances, it billed $18.43 and was reimbursed $13.75.

**Relator's Discovery of and Objections to the Illegal Billing Activity**

70.     Relator first learned that USA Drug planned to implement $4 generic pricing at USA Drug pharmacies to match Wal-Mart's pricing in conversations in 2008 with Defendants Stephen LaFrance, Jr. and Jason LaFrance, and with Joe Courtright, Chief Executive Officer of USA Drug; Kelly Barnes, District Manager for Jarco, Inc. and Daleco, Inc.; and Tiffany Letson, head of Acquisitions, USA Drug.   In multiple conversations, each of these individuals informed Relator that USA Drug pharmacies would be charging cash-paying customers the same $4 generic pricing as did Wal-Mart as part of the USA Drug company policy to match the prices of its competitors.   These conversations took place as part of the negotiations between Relator and the LaFrance defendants to sell his pharmacies to Jarco, Inc., one of the LaFrance affiliates.   Shortly after the LaFrance Defendants, through District Manager Kelly Barnes, directed store manager Jari Dawson to implement the $4 generic pricing for cash customers at the two drug stores that Relator previously owned in Sullivan, Missouri, and Linn, Missouri, Relator asked Dawson to find out if the USA Drug pharmacies, including his former stores, would also utilize the $4 generic pricing when billing Medicaid and other third-party insurers.   Dawson told Relator that Kelly Barnes, District Manager for Jarco, Inc. and Daleco, Inc., had told her that they would <u>not</u> be doing so. Instead, USA Drug would charge these lower prices to cash paying customers, thereby establishing the $4 pricing as its new "usual and customary charge," while continuing to bill higher amounts to third-

party insurers such as Medicaid in direct contravention of law and contractual agreements. Relator had independent access to the billing systems of several other USA Drug pharmacies in Missouri, and he confirmed through his review of the prescription sales data that these USA Drug pharmacies were not providing the $4 generic pricing to Medicaid.

71.     In 2008, and repeatedly thereafter, Relator was informed by USA Drug's management that the chain was implementing $4 generic pricing not only at Relator's former drug stores in Missouri, but at all the USA Drug pharmacies in the nation.  He learned it through the discussions referenced in Paragraph 70, *supra*, and through subsequent communications with Stephen LaFrance, Jr., Jason LaFrance, Joe Courtright, Kelly Barnes, and Jari Dawson.

72.     Upon learning of USA Drug's implementation of $4 generic pricing for cash paying customers but not for Medicaid, Relator expressed his objections to this practice in communications with Defendants Stephen LaFrance, Jr., and Jason LaFrance, and with Joe Courtright, and Kelly Barnes, noting, among other things, that implementation of such pricing for cash customers without making the same pricing available for Medicaid would be illegal and would expose the USA Drug pharmacies to liability if audited by Medicaid or other third-party plans.

73.     In response to Relator's statements of his concerns regarding USA Drug's failure to make the $4 generic pricing available to Medicaid, in or about March or April

2009, USA Drug CEO Joe Courtright defended USA Drug's decision by informing Relator that the Medicaid programs in the states in which the USA Drug does business have not been auditing pharmacies' compliance with Medicaid's "usual and customary charge" billing rule.  Since April 2009, Courtright has been a Director of the National Association of Chain Drug Stores, an organization located in Washington, D.C., that, among other things, "presents programs and services to assist chain pharmacies in complying with the law."  (*See* http://www.nacds.org/advocate/legalcompliance.aspx.)

74.    Relator also frequently expressed his view that USA Drug's $4 generic pricing is fraudulent in conversations with Strauser Drug pharmacists Shelley Jannings, Mary Howard, and Christie Starr.  Relator told them he would be glad to see the program end upon Walgreen's acquisition of the pharmacy business from Defendant LaFrance Holdings.  In frequent conversations with Jari Dawson, the former controller of Relator's former pharmacy company, Meramec Pharmacy, Inc. -- conversations that have taken place from the initiation of the $4 special savings plan until the present time -- Relator has expressed his concerns that the LaFrance Defendants' implementation of $4 generic pricing would not be legal unless such pricing were also made available to Medicaid and other insurance companies.  Relator has told Dawson he believes USA Drug has accumulated a tremendous potential liability.  Dawson currently works as the store manager at one of pharmacies that Relator sold to Jarco, Inc.

75.     Through the foregoing conduct, the Defendants knowingly have submitted and/or caused the submissions of false claims that have caused the federal-state Medicaid program, in each state in which the USA Drug pharmacies do business, to pay excessive amounts for many of the generic medications listed on the brochure in Exhibit B.  The United States and the state Plaintiffs have been damaged by the difference between their payments to the USA Drug pharmacies for the generic medications that are part of the Wal-Mart Stores, Inc. Program and the $4 generic pricing.

76.     Through the foregoing conduct, the Defendants have knowingly and improperly avoided an obligation to repay funds owed the United States and the state Plaintiffs, by improperly failing to disclose and return overpayments.  The United States and the state Plaintiffs have been damaged by the difference between their payments to the USA Drug pharmacies for the generic medications that are part of the Wal-Mart Stores, Inc. Program and the $4 generic pricing.

## <u>COUNT I</u>

(Federal False Claims Act, 31 U.S.C. § 3729(a))

77.     This is a civil action by Plaintiff J. Douglas Strauser, acting on behalf of and in the name of the United States, against the Defendants under the False Claims Act.

78.     Plaintiff realleges and incorporates by reference paragraphs 1 through 76 as though fully set forth herein.

79.     The Defendants knowingly have presented or have caused to be presented false or fraudulent claims for payment by the United States, in violation of 31 U.S.C. § 3729(a)(1)(A) (post-May 2009 amendment) and 31 U.S.C. § 3729(a)(1) (pre-May 2009 amendment).

80.     The Defendants knowingly have made or used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States, in violation of 31 U.S.C. § 3729(a)(1)(B) (post-May 2009 amendment) and 31 U.S.C. § 3729(a)(2) (pre-May 2009 amendment).

81.     The Defendants have knowingly and improperly avoided obligations to pay or transmit money to the Government, in violation of 31 U.S.C. § 3729 (a)(1)(G) (2009).

82.     Because of the Defendants' conduct set forth in this Count, the United States has suffered actual damages in the hundreds of millions of dollars, with the exact amount to be determined at trial.

## COUNT TWO

(New Jersey False Claims Act, N.J. Stat. § 2A:32C-1 *et seq.*)

83.     Plaintiff re-alleges Paragraphs 1 through 81, inclusive.

84.     Based on the foregoing allegations, the Defendants are liable under the New Jersey False Claims Act, N.J. Stat. § 2A:32C-1 *et seq.*

## COUNT THREE

(Oklahoma Medicaid False Claims Act, 63 Okl. St. § 5053 *et seq.*)

85.     Plaintiff re-alleges Paragraphs 1 through 81, inclusive.

86.     Based on the foregoing allegations, the Defendants are liable under the Oklahoma Medicaid False Claims Act, 63 Okl. St. § 5053 *et seq.*

## COUNT FOUR

(Tennessee Medicaid False Claims Act, Tenn. Code § 71-5-181 *et seq.*)

87.     Plaintiff re-alleges Paragraphs 1 through 81, inclusive.

88.     Based on the foregoing allegations, the Defendants are liable under the Tennessee Medicaid False Claims Act, Tenn. Code § 71-5-181 *et seq.*

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff J. Douglas Strauser prays for the following relief:

1.     On Counts One through Four, judgment for the United States or the State, as applicable, against the Defendants in an amount equal to three times the damages the federal or state plaintiff government, respectively, has sustained because of the Defendants' actions, plus a civil penalty of $11,000 for each violation;

2.     On Counts One through Four, an award to the Relator of the maximum allowed under the federal or state law under which suit is brought by the Relator on behalf of the federal or state plaintiff, respectively;

3.      Against the Defendants, attorneys' fees, expenses and costs of suit; and

4.      Such other and further relief as the Court deems just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands that this matter be tried before a jury.

Respectfully submitted,

_____
Timothy D. Eisel, OBA #15266
Eisel Law
P.O. 30896
Edmund, Oklahoma 73003
Tel. No. 405-476-3666
Fax No. 405-359-5666



_____
Shelley R. Slade
(*Pro hac vice* application pending)
Robert L. Vogel
(*Pro hac vice* application pending)
Janet L. Goldstein
(*Pro hac vice* application pending)
VOGEL, SLADE & GOLDSTEIN, LLP
1718 Connecticut Avenue, NW, 7th Floor
Washington, D.C. 20009
Tel.: 202-537-5903
sslade@vsg-law.com

Attorneys for J. Douglas Strauser

Dated:  May 14, 2013