FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

MAR 0 2 2015

ANGELA REEDER SHINN, CLERK
U.S. DIST. COURT, WESTERN DIST. OKLA.
BY_____,DEPUTY

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* J. DOUGLAS STRAUSER, STATE OF NEW JERSEY *ex rel.* J. DOUGLAS STRAUSER, STATE OF OKLAHOMA *ex rel.* J. DOUGLAS STRAUSER, and STATE OF TENNESSEE *ex rel.* J.DOUGLAS STRAUSER, <br><br> Plaintiffs, <br><br> v. <br><br> STEPHEN L. LaFRANCE HOLDINGS, INC., STEPHEN L. LaFRANCE PHARMACY, INC., SUPER D DRUGS ACQUISITION CO., DALECO, INC., ARCADIA VALLEY DRUG CO., MAY'S DRUG STORES, INC., ELLISVILLE DRUG ACQUISITION CO., JARCO PHARMACIES, INC., JIM BAIN'S PHARMACY, INC., S & W PHARMACY, INC., CONSOLIDATED STORES, INC., PHARM-MART PHARMACY OF WARREN, INC., STEPHEN L. LaFRANCE, JR., JASON LaFRANCE, and WALGREEN COMPANY, INC. <br><br> Defendants. | CIVIL ACTION NO. 13-495 M <br><br> FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b) <br><br> JURY TRIAL REQUESTED |

## FIRST AMENDED COMPLAINT
### (False Claims Act)

### SUMMARY STATEMENT

1.    This lawsuit involves hundreds of millions of dollars in false claims

submitted to the federal Medicare Part D program, the federal-state Medicaid

Programs in Arkansas, Kansas, Mississippi, Missouri, New Jersey, Oklahoma, and Tennessee, and other government health plans (hereinafter collectively referred to as "Government Health Plans") by pharmacies, some, but not all of which are set forth in Exhibit A, that were owned and controlled by Defendants Stephen L. LaFrance Holdings, Inc., Stephen L. LaFrance Pharmacy, Inc., Stephen L. LaFrance, Jr., and Jason LaFrance. These pharmacies, many of which did business using the name USA Drug, since 2008 have systematically billed Government Health Plans for generic drugs at prices far in excess of the special savings prices that they usually and customarily charge to cash-paying members of the general public. They have done so in knowing violation of Medicare Part D contracts, Medicaid billing rules and other Government Health Plan billing requirements that require pharmacies to charge these government health care programs their "usual and customary charge to the general public." Moreover, to reduce their risk of Government Health Plans learning of these overpayments, the pharmacies have hidden from them the special savings prices that they charge the general public for generic drugs. For certain generic medications, such as the anti-depressant Fluoxetine, these pharmacies have charged Medicaid prices that have been as much as 38 times the prices charged to the general public, and Medicaid has paid more than five times the amount paid by members of the general public. Defendant Walgreen Company purchased this pharmacy chain in September 2012.

The chain continued to engage in the foregoing wrongful practices in many stores for as long as six additional months after the purchase by Walgreen Company. Walgreen has known of the overpayments resulting from USA Drug's failure over many years to make its special savings prices on generic drugs available to government health care programs, but has illegally failed to disclose and refund the overpayments to the affected government programs.

2.      *Qui Tam* Plaintiff J. Douglas Strauser ("Strauser" or "Relator") brings this civil action on behalf of and in the name of the United States of America ("United States") under the *qui tam* provisions of the federal False Claims Act, 31 U.S.C. §§ 3729-3733, and on behalf of and in the name of the state plaintiffs under analogous *qui tam* provisions in state false claims laws.

## JURISDICTION AND VENUE

3.      All Counts of this Complaint are civil actions by Relator, acting on behalf of and in the name of the United States and the state plaintiffs, against the Defendants under the federal False Claims Act, 31 U.S.C. §§ 3729-3733, and analogous state false claims laws.

4.      This Court has jurisdiction over the claims brought on behalf of the United States pursuant to 28 U.S.C. §§ 1331 and 1345, and 31 U.S.C. § 3732(a).

5.     This Court has supplemental jurisdiction over the claims brought on behalf of the state plaintiffs under 28 U.S.C. § 1367. In addition, the Court has jurisdiction over the state law claims alleged herein under 31 U.S.C. § 3732(b).

6.     Defendant Walgreen Company, Inc. transacts business in this judicial district. In addition, Defendants Stephen L. LaFrance Holdings, Inc., Stephen L. LaFrance, Jr., and Jason LaFrance have violated the federal False Claims Act in this judicial district as a result of the misconduct alleged herein. Accordingly, this Court has personal jurisdiction over the Defendants, and venue is appropriate in this district. The False Claims Act provides that any action under 31 U.S.C. § 3730 may be brought "in any judicial district in which . . . any one defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred." 31 U.S.C. § 3732(a). Venue is also proper under 28 U.S.C. § 1391.

7.     None of the allegations set forth in this Complaint is based on a public disclosure of allegations or transactions in a criminal, civil or administrative hearing, in a congressional, administrative or General Accounting Office report, hearing, audit or investigation, or from the news media. Relator J. Douglas Strauser has direct and independent knowledge of the information on which the allegations set forth in this Complaint are based. Moreover, prior to filing this lawsuit and prior to any public disclosures regarding this matter, Relator

voluntarily provided the information set forth herein to agents of the United States Department of Justice and the state plaintiffs.

## THE PARTIES

### Relator J. Douglas Strauser

8.     Strauser, a resident of Sullivan, Missouri, is a licensed pharmacist with a strong interest in public health policy and civic governance.

9.     Strauser obtained his pharmacy license in 1976 after graduating that year from St. Louis College of Pharmacy, St. Louis, Missouri, with a Bachelor of Science in Pharmacy.  At various times throughout the period 1976 to 2008, he owned and operated pharmacies in Sullivan, Missouri, Linn, Missouri, and Steelville, Missouri.  On June 30, 2008, he sold his pharmacy business, known as Meramec Pharmacy, Inc., to Defendant Jarco, Inc. ("Jarco"), an entity under common ownership and control with Defendant Stephen L. LaFrance Pharmacy, Inc. ("LaFrance Pharmacy").  In 2012, Defendant Jarco sold its drugstores to Defendant LaFrance Pharmacy, and Defendant Walgreen Company, Inc. ("Walgreen") purchased Defendant LaFrance Pharmacy.  As a result of its 2012 acquisition of the stock of Defendant, LaFrance Pharmacy, Defendant Walgreen now controls Strauser Drugs.  Strauser worked as a part-time pharmacist at Strauser Drugs, one of the pharmacies he sold to Defendant Jarco, until June 2013.

10.     Strauser has served his community in a variety of civic positions.  In 1982, he founded the Sullivan Emergency Assistance Fund, an organization still operating today, that is designed to offer one-time financial assistance to families in need during a time of crisis.  Between 1989 and 1992, he served as Alderman, Board President and Mayor of the City of Sullivan, Missouri.  Subsequently, he served for 13 years as President of the Board of the local public school district. Strauser is also a Director of the Bank of Sullivan.

### Plaintiff United States of America

11.     Relator J. Douglas Strauser brings this action on behalf of the United States pursuant to the *qui tam* provisions of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq*.

12.     The United States of America, acting through the Centers for Medicare and Medicaid Services ("CMS") of the U.S. Department of Health & Human Services ("HHS"), oversees and reimburses the states for a portion of their expenditures for the joint federal-state Medicaid program.  Medicaid, a health insurance program for the financially needy, was established under Title XIX of the Social Security Act, 42 U.S.C. §1396 *et seq*., and state laws.

13.     CMS also administers the Health Insurance for the Aged and Disabled Program, popularly known as Medicare, which was established under Title  XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq*.  A person generally is eligible

to enroll in Medicare if they are 65 years or older, if they have End Stage Renal Disease, or if they are disabled.  Reimbursement for Medicare claims is made by the United States through CMS.

14.    On behalf of the United States, Relator seeks to recover for damages resulting from false claims submitted to the federal Medicare Part D program, the federal-state Medicaid drug benefit program and other Government Health Plans.

## State Plaintiffs

15.    Relator also brings this action on behalf of the states of New Jersey, Oklahoma and Tennessee ("the state plaintiffs").  He brings this action under the *qui tam* provisions of the following false claims laws of the state plaintiffs:  the New Jersey False Claims Act, N.J. Stat. §§ 2A:32C-1 *et seq.*; the Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63, §§ 5053 *et seq.*; and the Tennessee Medicaid False Claims Act, Tenn. Code §§ 71-5-181 *et seq.*

16.    The state plaintiffs participate in the Medicaid program under which, under certain circumstances, they pay the costs of providing pharmaceutical drugs to indigent persons who are the beneficiaries of the program.  The Medicaid program agencies of the state plaintiffs pay pharmacies for medications on behalf of Medicaid beneficiaries.  The state plaintiffs then seek reimbursement for a portion of these expenditures from the federal government.

17.    On behalf of the state plaintiffs, Relator seeks recovery for damages caused by the submission of false claims to state-funded health insurance programs, including but not limited to the federal-state Medicaid programs that are jointly funded by the United States and the state plaintiffs.

## Defendant Walgreen Company, Inc.

18.    Defendant Walgreen Company, Inc. ("Walgreen") is the leading chain drug store in the country in terms of sales and profits. As of February 28, 2013, Defendant Walgreen owned and operated approximately over 8,000 drug stores in the United States, including 116 in Oklahoma. In the fiscal year ending August 31, 2012, Walgreen had sales of $71.6 billion and profits of $2.3 billion. The company is headquartered in Deerfield, Illinois, and incorporated in Illinois. Walgreen's pharmacies dispense prescription medications in this judicial district as well as in each of the other states named as plaintiffs herein.

19.    On July 5, 2012, Defendant Walgreen announced that it was acquiring the USA Drug pharmacy business, including 144 stores, corporate offices, a distribution center, and a wholesale and brand business, from Stephen L. LaFrance Holdings, Inc. and members of the LaFrance family. Walgreen's press release represented that Walgreen would pay $438 million for the pharmacy chain, subject to adjustments in certain circumstances. Walgreen's public statement noted that

the pharmacy chain it was acquiring recorded sales of $825 million in 2011. The transaction was completed on September 17, 2012.

### Defendant Stephen L. LaFrance Holdings, Inc.

20.     Defendant Stephen L. LaFrance Holdings, Inc. ("LaFrance Holdings") was founded by Stephen L. LaFrance, Sr., a pharmacist who lived in Pine Bluff, Arkansas.   The company was incorporated in Delaware on July 14, 1997.   Its headquarters are in Little Rock, Arkansas.   From at least 2008 until its stock was purchased by Walgreen, the owner and chairman of the company was Stephen L. LaFrance, Sr., and its officers and directors included Stephen L. LaFrance, Sr., his sons Stephen L. LaFrance, Jr., and Jason LaFrance, and Michael Kerr.

21.     LaFrance Holdings, along with Defendants LaFrance Pharmacy, Inc and Stephen L. LaFrance, Jr. and Jason LaFrance, between 2008 and the Fall of 2012, owned and controlled a group of affiliated, corporate entities ("the LaFrance affiliates") that, in turn, collectively owned a chain of pharmacies that were operated and controlled as a single enterprise, with Joe Courtright as Chief Executive Officer and many of the pharmacies using the "doing business as" name of USA Drug ("the USA Drug pharmacies"). These pharmacies include, but are not limited to, the pharmacies set forth in Exhibit A. These LaFrance affiliates included companies such as: Defendant LaFrance Pharmacy, Inc., incorporated in Arkansas on June 26, 1972; Defendant Jarco Pharmacies, Inc., incorporated in Arkansas on March 28, 2008;

Daleco, Inc., incorporated in Arkansas on June 4, 2003; Super D Drugs Acquisition Co., incorporated in Delaware on September 11, 1997; Arcadia Valley Drug Co., incorporated in Arkansas on March 28, 2005; May's Drug Store, incorporated in Oklahoma on August 30, 1972; Ellisville Drug Acquisition Co., incorporated in Arkansas on March 22, 2002; Jim Bain's Pharmacy, Inc., incorporated in Mississippi on June 9, 1986; and Mr. Discount Drugs of South Jackson, Inc., incorporated in Mississippi on November 8, 1977.

22.    The LaFrance affiliates operated under the common management of the officers of LaFrance Holdings and Stephen L. LaFrance Pharmacies, Inc.  Each and every one of these entities had Stephen L. LaFrance, Stephen L. LaFrance, Jr. or Jason LaFrance on its Board of Directors, and all but one of these entities had two out of these three individuals on its Board.  In addition, Joe Courtright, the president of LaFrance Pharmacy, Inc., was also the president or CEO of Super D Drugs Acquisition Co., Jim Bain's Pharmacy, and Mr. Discount Drugs of South Jackson, Inc.  Michael Kerr, the vice president of both LaFrance Holdings and LaFrance Pharmacy, Inc., was also vice president of Super D Drugs Acquisition Co. and May's Drug Store.

23.    The LaFrance affiliates shared the brands USA Drug, Select Brand, Super D Drug, May's Drug, Med-X, and Drug Warehouse, and many of their pharmacies were known as USA Drug pharmacies, often with reference to one of the

additional brands as well.  USA Drug was the most common "doing business as" name of the LaFrance affiliates, and Courtright used the title "President and CEO of USA Drug Stores, Inc."

24.   By September 17, 2012, LaFrance Pharmacy, had consolidated under its ownership most if not all of the LaFrance affiliates, which at the time collectively owned approximately 144 pharmacies in Arkansas, Mississippi, Missouri, New Jersey, Oklahoma, and Tennessee.  On September 17, 2012, Defendant Walgreen purchased the stock of LaFrance Holdings for $438 million, thereby becoming the owner of Defendant LaFrance Pharmacy.  Walgreen also purchased the assets or stock of certain affiliated entities.  Many of these pharmacies did business under the name of USA Drug, while some of the pharmacies also did business under other names, such as  Super D Drug, May's Drug, Med-X, Drug Warehouse, Strauser Drug and others (these pharmacies are collectively referred to herein as "the USA Drug pharmacies").  When Defendant Walgreen purchased Defendant LaFrance Pharmacy on September 17, 2012, it thereby acquired the USA Drug pharmacy business, a business that generated $825 million in revenue in 2011, according to Walgreen's press release at the time.  In 2010, Walgreen had purchased 17 other pharmacies in the Memphis, Tennessee market that were part of the USA Drug chain of pharmacies.

## **Defendant Stephen L. LaFrance Pharmacy, Inc.**

25.    Defendant Stephen L. LaFrance Pharmacy, Inc. (or "LaFrance Pharmacy") was incorporated on June 26, 1972 in Pine Bluff, Arkansas, by Stephen L. LaFrance, who continued as Chairman of the Board until the company's purchase by Walgreen.  Between 2008 and September 2012, its officers and directors have included Joe Courtright, Mike Kerr, Stephen L. LaFrance, Jr., and Jason LaFrance. Between 2008 and 2012, LaFrance Pharmacy did business using the name USA Drug.  LaFrance Pharmacy has formed part of a common enterprise of pharmacy stores owned by members of the LaFrance family and operated under common management.  As a result of Walgreen's purchase of the stock of Stephen L. LaFrance Holdings, Inc., on September 17, 2012, Walgreen became the owner of LaFrance Pharmacy.  The company's current board of directors and officers include: Mark A. Wagner ("Wagner"), the president of operations at Walgreen; John A. Mann ("Mann"), divisional vice president for tax at Walgreen; Robert M. Silverman ("Silverman"), divisional vice-president of corporate and transactional law at Walgreen; Jason M. Dubinsky ("Dubinsky"), divisional vice president and treasurer at Walgreen; Kermit R. Crawford ("Crawford"), president of pharmacy, health and wellness at Walgreen; and Rick Hans ("Hans"), divisional vice president for investor relations & finance at Walgreen.  After the purchase by Walgreen, Wagner became the president of LaFrance Pharmacy.

## Defendant Super D Drugs Acquisition Co.

26.     Defendant Super D Drugs Acquisition Co. was incorporated on September 11, 1997, in Delaware by Stephen L. LaFrance, who continued as Chairman of the Board until the company's purchase by Walgreen.  Between 2008 and September 2012, its officers and directors have included Joe Courtright, Mike Kerr, Stephen L. LaFrance, Jr., and Jason LaFrance.  Between 2008 and 2012, LaFrance Pharmacy did business using the names of some of the USA Drug pharmacies, including, for example, the pharmacy USA Drug in Malden, Missouri. Super D. Drugs Acquisition Co. has formed part of a common enterprise of pharmacy stores owned by members of the LaFrance family and operated under common management.  As a result of Walgreen's purchase of the stock of Stephen L. LaFrance Holdings, Inc., on September 17, 2012, Walgreen became the owner of Super D Drugs Acquisition, Co.  The company's current board of directors and officers include Walgreen's executives Wagner, Mann, Silverman, Dubinsky, Crawford, and Hans.  After the purchase by Walgreen, Wagner became the president of Super D Drugs Acquisition Co.

## Defendant Daleco, Inc.

27.     Defendant Daleco, Inc. was incorporated on June 4, 2003, in Arkansas. Stephen L. LaFrance, Jr. was Chairman of the Board until the company was purchased by Defendant LaFrance Pharmacy shortly before Defendant Walgreen

acquired the latter company.  Between 2008 and September 2012, the officers and directors of Daleco, Inc. have included Jason LaFrance and Kelly Barnes.  Between 2008 and 2012, Daleco, Inc., did business using the names of some of the USA Drug pharmacies, including, for example, the pharmacy USA Drug in Farmington, MO. Defendant Daleco has formed part of a common enterprise of pharmacy stores owned by members of the LaFrance family and operated under common management. As a result of Walgreen's purchase of the stock of Stephen L. LaFrance Holdings, Inc., on September 17, 2012, Walgreen became the owner of the drug stores previously owned by Daleco, Inc.

### Defendant Arcadia Valley Drug Co.

28.     Defendant Arcadia Valley Drug Co. was incorporated as AV Drug Acquisition Co. on February 24, 2005 in Arkansas by Stephen L. LaFrance, Jr., who continued as Chairman of the Board until the company was purchased by Defendant LaFrance Pharmacy shortly before Defendant Walgreen acquired the latter company. AV Drug Acquisition Co.'s name was changed to Arcadia Valley Drug Co. on May 11, 2005.  Between 2008 and September 2012, the company's officers and directors have included Jason LaFrance and Kelly Barnes.  Between 2008 and 2011, Arcadia Valley Drug Co. did business using the names of some of the USA Drug pharmacies including, for example, the pharmacy USA Drug in Ironton, MO.  This company has formed part of a common enterprise of pharmacy stores owned by members of the

LaFrance family and operated under common management. As a result of Walgreen's purchase of the stock of Stephen L. LaFrance Holdings, Inc., on September 17, 2012, Walgreen became the owner of the drug stores previously owned by Arcadia Valley Drug Co.

## Defendant May's Drug Stores, Inc.

29.     Defendant May's Drug Stores, Inc., an owner of one or more pharmacies, was incorporated in the State of Oklahoma on August 21, 1972. It was purchased by defendant LaFrance Pharmacy, Inc. in 2004. Its directors and officers have included Stephen L. LaFrance, Stephen L. LaFrance, Jr., Jason LaFrance, Joe Courtright, and Michael Kerr. The company has done business using the name USA Drug and May's Drug. This company has formed part of a common enterprise of pharmacy stores owned by members of the LaFrance family and operated under common management. As a result of Walgreen's purchase of the stock of Stephen L. LaFrance Holdings, Inc., on September 17, 2012, Walgreen became the owner of May's Drug Stores, Inc. The company's current board of directors and officers include Walgreen's executives Wagner, Mann, Silverman, Dubinsky, Crawford, and Hans.

## Defendant Ellisville Drug Acquisition Co.

30.     Defendant Ellisville Drug Acquisition Co., an owner of one or more pharmacies, was incorporated in the State of Arkansas on February 22, 2002. Its

directors and officers have included Stephen L. LaFrance, Jr., and Jason LaFrance. The company has formed part of a common enterprise of pharmacy stores owned by members of the LaFrance family and operated under common management.  As a result of Walgreen's purchase of the stock of Stephen L. LaFrance Holdings, Inc., on September 17, 2012, Walgreen became the owner of the drug stores previously owned by Ellisville Drug Acquisition Co.

## Defendant Jarco Pharmacies, Inc.

31.    Defendant Jarco Pharmacies, Inc. was incorporated on March 28, 2008 in Arkansas by Stephen L. LaFrance, who was Chairman of the Board until the company was purchased by Defendant LaFrance Pharmacy shortly before Defendant Walgreen acquired the latter company.   Between 2008 and September 2012, its officers and directors have included Stephen L. LaFrance, Jr., and Jason LaFrance. Between 2008 and 2010, Jarco Pharmacies, Inc., did business using the names of some of the USA Drug pharmacies, including the name Strauser Drugs, in Sullivan, Missouri. This company has formed part of a common enterprise of pharmacy stores owned by members of the LaFrance family and operated under common management. As a result of Walgreen's purchase of the stock of Stephen L. LaFrance Holdings, Inc., on September 17, 2012, Walgreen became the owner of the drug stores previously owned by Jarco Pharmacies, Inc.

## Defendant Jim Bain's Pharmacy, Inc.

32.    Defendant Jim Bain's Pharmacy Inc., an owner of one or more pharmacies, was incorporated in the State of Mississippi on June 9, 1986. It was purchased by defendant LaFrance Pharmacy in 2008. Its directors and officers have included Stephen L. LaFrance, Stephen L. LaFrance, Jr., Jason LaFrance, Joe Courtright, and Michael Kerr. This company has formed part of a common enterprise of pharmacy stores owned by members of the LaFrance family and operated under common management. As a result of Walgreen's purchase of the stock of Stephen L. LaFrance Holdings, Inc., on September 17, 2012, Walgreen became the owner of the drug stores previously owned by Jim Bain's Pharmacy, Inc. The company's current board of directors and officers include Walgreen's executives Wagner, Mann, Silverman, Dubinsky, Crawford, and Hans.

## Defendant S & W Pharmacy, Inc.

33.    Defendant S & W Pharmacy, Inc., an owner of one or more pharmacies, was incorporated in the State of Arkansas on September 10, 1970. Its directors and officers have included Stephen L. LaFrance. The company has done business using the name USA Drug. This company has formed part of a common enterprise of pharmacy stores owned by members of the LaFrance family and operated under common management. As a result of Walgreen's purchase of the stock of Stephen L.

LaFrance Holdings, Inc., on September 17, 2012, Walgreen became the owner of the drug stores previously owned by S & W Pharmacy, Inc.

### Defendant Pharm-Mart Pharmacy of Warren, Inc.

34.     Defendant Pharm-Mart Pharmacy of Warren, Inc., an owner of one or more pharmacies, was incorporated in the State of Arkansas on April 4, 1972.  Its directors and officers have included Stephen L. LaFrance and Stephen L. LaFrance, Jr.  The company has done business using the name USA Drug.  This company has formed part of a common enterprise of pharmacy stores owned by members of the LaFrance family and operated under common management.   As a result of Walgreen's purchase of the stock of Stephen L. LaFrance Holdings, Inc., on September 17, 2012, Walgreen became the owner of the drug stores previously owned by Pharm-Mart Pharmacy of Warren, Inc.

### Defendant Consolidated Stores, Inc.

35.     Defendant Consolidated Stores, Inc., an owner of one or more pharmacies, was incorporated in the State of Arkansas on June 21, 1985.  Its directors and officers have included Stephen L. LaFrance. The company has done business using the name USA Drug.  This company has formed part of a common enterprise of pharmacy stores owned by members of the LaFrance family and operated under common management.  As a result of Walgreen's purchase of the stock of Stephen L.

LaFrance Holdings, Inc., on September 17, 2012, Walgreen became the owner of the drug stores previously owned by Consolidated Stores, Inc.

### Defendant Stephen L. LaFrance, Jr.

36.     Through September 2008, Stephen L. LaFrance, Jr., the son of Stephen L. LaFrance, was the secretary of Defendant Stephen L. LaFrance Holdings, Inc., as well as a member of the board of directors of the following companies which owned pharmacies doing business under the USA Drug name:  LaFrance Pharmacy; Jarco Pharmacies, Inc.; Daleco, Inc.; Super D Drugs Acquisition Co.; and Jim Bain's Pharmacy, Inc.   He was also the president of the following companies: Jarco Pharmacies, Inc.; Daleco, Inc.; Ellisville Drug Acquisition Co.; and Arcadia Valley Drug Co.  The foregoing entities were operated as a single enterprise – USA Drug – under the executive control of Joe Courtright, Chief Executive Officer.  Stephen L. LaFrance, Jr., is a resident of Little Rock, Arkansas.  (The name "USA Drug" is used herein to refer to this single enterprise.)

### Defendant Jason LaFrance

37.     Through September 2008, Jason LaFrance, the son of  Stephen L. LaFrance, was executive vice president at Stephen L. LaFrance Holdings, Inc., as well as a member of the board of directors at the following companies which owned pharmacies doing business under the USA Drug name:  LaFrance Pharmacy; Jarco Pharmacies, Inc.; Super D Drugs Acquisition Co.; Arcadia Valley Drug Co.; May's

Drug Store; Ellisville Drug Acquisition Co.; Jim Bain's Pharmacy, Inc.; and Mr. Discount Drugs of South Jackson, Inc.  He was also the vice president of Jarco Pharmacies, Inc., Arcadia Valley Drug Co., Jim Bain's Pharmacy, Inc., and Mr. Discount Drugs of South Jackson, Inc.  The foregoing entities were operated as a single enterprise – USA Drug – under the executive control of Joe Courtright, Chief Executive Officer.  Jason LaFrance is a resident of Little Rock, Arkansas.

## APPLICABLE LAW

### The Federal False Claims Act

38.     Prior to May 20, 2009, the FCA imposed treble damages liability on any person who, *inter alia*:

(i)     Knowingly presented or caused to be presented a false or fraudulent claim to the United States for payment, 31 U.S.C. § 3729(a)(1) (2000);

(ii)     Knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the United States, *id*. § 3729(a)(2); or

(iii)     Knowingly made, used, or caused to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States.

31 U.S.C. § 3729(a)(1), (2) and (7) (pre-May 20, 2009). A "claim" under the pre-May 2009 FCA was defined as "any request or demand, whether under a contract or otherwise, for money or property" that "is made to a contractor . . . if the United States government provides or has provided any portion of the money or property requested or demanded" or "will reimburse such contractor . . . for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(c) (pre-May 20, 2009).

39. On May 20, 2009, Congress amended the FCA "to reflect the original intent of the law." S. Rep. 111-10, at 10 (Mar. 23, 2009); *see* 111 Pub. L. 21, 123 Stat. 1617 (2009) (enacting the Fraud Enforcement and Recovery Act of 2009 ("FERA")). As clarified by FERA, the FCA imposes liability on any person who, *inter alia*:

(i)   Knowingly presents or causes to be presented a false or fraudulent claim for payment by the United States,

(ii)   Knowingly makes, uses, or causes to be made or used, a false record or statement *material to* a false or fraudulent claim paid or approved by the United States, or

(iii)   Knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the Government, or who knowingly conceals or knowingly

and improperly avoids or decreases an obligation to pay or transmit money or property to the United States.

31 U.S.C. § 3729(a)(1)(A), (B) and (G) (post-May 20, 2009).

In FERA, Congress clarified the earlier definition of "claim" so that it now provides as follows:

> The term claim:
> (A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that–
> (i) is presented to an officer, employee, or agent of the United States; or
> (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government–
> (I) provides or has provided any portion of the money or property requested or demanded; or
> (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; and
> (B) does not include requests or demands for money or property that the Government has paid to an individual as compensation for Federal employment or as an income subsidy with no restrictions on that individual's use of the money or property.

31 U.S.C. § 3729(b)(2) (post-May 20, 2009). This broad definition of "claim" ensures that FCA liability can attach to any false "request[] or demand[] for money and property from the U.S. Government, without regard to whether the United States holds title to the funds . . . ." S. Rep. 111-10, *supra*, at 12–13

## The State False Claims Acts

### New Jersey

40.     The New Jersey false claims act, in relevant part, establishes liability for

any person who:

(i)     Knowingly presents or causes to be presented a false or fraudulent

claim to the state for payment, N.J. Stat.§ 2A:32C-3(a);

(ii)    Knowingly makes, uses, or causes to be made or used, a false record

or statement to get a false or fraudulent claim paid or approved by the

State, *id*. § 2A:32C-3(b); or

(iii)   Knowingly makes, uses, or causes to be made or used a false record or

statement to conceal, avoid, or decrease an obligation to pay or

transmit money or property to the State.

N.J. Stat. § 2A:32C-3(a), (b) and (g).

The New Jersey false claims law defines the term "claim" as : "a request or demand,

under a contract or otherwise, for money, property, or services" that "is made to any

employee, officer, or agent of the state, or to any contractor . . . or other recipient if

the State provides any portion of the money, property, or services requested or

demanded" or if the state "will reimburse the contractor . . . or other recipient for any

portion of the money, property, or services requested or demanded." *Id*. § 2A:32C-2.

## Oklahoma

41.    Oklahoma's FCA establishes liability for any person who:

(i)    Knowingly presents or causes to be presented a false or fraudulent claim to the state for payment, *id.* § 5053.1(B)(1);

(ii)    Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State, *id.* § 5053.1(B)(2); or

(iii)    Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State,

Okla. Stat. tit. 63, § 5053.1(B)(1), (2) and (7).

The Oklahoma false claims law defines the term "claim" as "any request or demand, whether under a contract or otherwise, for money or property" that "is made to a contractor . . . or other recipient if this state provides any portion of the money or property which is requested or demanded" or if the state "will reimburse the contractor . . . or other recipient for any portion of the money or property which is requested or demanded." *Id.* § 5053.1(A)(2).

## Tennessee

42.    Before April 23, 2012, the Tennessee Medicaid False Claims Act's liability provisions and definition of "claim" mirrored those in the pre-FERA

federal FCA.  *See* 2012 Tenn. Pub. Acts 806 (amending the Tennessee Medicaid FCA).  Since April 23, 2012, the state's law has mirrored the post-FERA federal FCA. *See id*.  Thus, the law establishes liability for any person who:

> (i)     Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval under the state's Medicaid program, Tenn. Code § 71-5-182(a)(1)(A);
>
> (ii)    Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim paid or approved under the state's Medicaid program, *id*. § 71-5-182(a)(1)(B); or
>
> (iii)   Knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the state, or who knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state relative to the Medicaid program

Tenn. Code. § 71-5-182 (a)(1)(A), (B) and (D).

A "claim" under the Tennessee Medicaid FCA includes "any request or demand, whether under a contract or otherwise, for money or property and whether or not the state has title to the money or property" that "is presented to any employee, officer, or agent of the state, or is made to any contractor . . . or other recipient, if the money or property is to be spent or used on the state's behalf or to advance a

state program or interest" if the state "provides or has provided any portion of the money or property requested or demanded" or if the state "will reimburse such contractor . . . or other recipient for any portion of the money or property which is requested or demanded." *Id.* § 75-5-182(c).

### Medicaid Billing Requirement:
### "Usual And Customary Charge To The General Public"

43.    As a condition of a state's obtaining federal reimbursement for a portion of the state's Medicaid expenditures, the federal government requires each state to comply with a number of specific requirements that are set forth in federal regulations.    One of these federal requirements relates to the appropriate reimbursement for pharmaceutical drugs.    The federal government will not reimburse a state for its Medicaid expenditures for prescription drugs unless the state complies with certain payment limits. To get federal reimbursement, the state must pay no more than the lowest of three separate rates, one of which is the dispensing pharmacy's "usual and customary charge to the general public" for the drug. 42 C.F.R. § 447.512(b).

44.    To comply with the federal regulation described in the preceding paragraph, state Medicaid programs have enacted rules that require pharmacies to bill Medicaid no more than their "usual and customary charge to the general public" for prescription drugs.  The states have enacted these rules in statutes, regulations, and/or manuals that set forth instructions for pharmacies billing

Medicaid.  The states require providers, including pharmacies, that bill Medicaid to certify that they will comply and are in compliance with Medicaid program rules and instructions.

45.    The term "Usual and Customary charge" is understood throughout the pharmacy industry to refer to the amount a pharmacy charges "cash paying" customers, i.e., customers paying for medication using their own personal resources rather than a private or government health care insurance policy.

46.    Since October 2003, federal law has mandated that pharmacies submitting claims electronically to Medicaid and all other payers use a standard claim format for electronic transactions published by the National Council for Prescription Drug Programs ("NCPDP"), a pharmaceutical industry group that has promoted standardization in the pharmaceutical industry since 1977. *See* 45 C.F.R. § 162.1102(a)–(c) (adopting the NCPDP standard as the mandatory standard for retail pharmacy electronic drug claims under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA")).

47.    The NCPDP's standard format includes a field for "usual and customary charge" which the format's instructions define to mean the "[a]mount charged cash paying customers for the prescription exclusive of sales tax or other amounts claimed." *See NCPDP Reference Manual*, Ch. 3, p. 72 (Rev. Oct. 2005), *available at* http://www.cms.gov/Medicare/Billing/ElectronicBillingEDITrans/

downloads/ NCPDPflatfile.pdf. The NCPDP designates this field as "optional," meaning that it must be filled out by the pharmacy only if required by the payer. *See, e.g.*, Arkansas Medicaid, *NCPDP Payer Sheet Version D.0*, at 16 (Oct. 18, 2011), *available at* https://www.medicaid.state.ar.us/download/provider/hipaa/ ncpdp_d0_payer.doc (stating that, under the NCPDP Telecommunications Standard Implementation Guide, this field is "[r]equired if needed per trading partner agreement").

48.   The states in which USA Drug has operated stores – *i.e.*, Arkansas, Kansas, Mississippi, Missouri, New Jersey, Oklahoma and Tennessee – require a pharmacy billing the state Medicaid program to complete the "usual and customary" field in the standard NCPDP format so as to represent to Medicaid the "[a]mount charged cash paying customers for the prescription exclusive of sales tax or other amounts claimed." *See* Arkansas Medicaid, *NCPDP Payer Sheet Version D.0, supra*, at 16; Kansas Medical Assistance Program, *NCPDP Version D.0 and 1.2 Transactions Payer Sheets, Standard Companion Guide, Transaction Information*, Version 2.2 (Dec. 21, 2011), at 10, *available at* https://www.kmap-state-ks.us/Documents/EDI/2011-1221%20NCPDP%20D%200.pdf;   Mississippi Medicaid Fee for Service, *Request Claim Billing/Claim Rebill (B1/B3) Payer Sheet*, at 3 (August 2013), *available at* http://www.medicaid.ms.gov/wp-content/uploads/2014/04/MS-NCPDP.pdf; Missouri HealthNet, *NCPDP Version*

*D.0 Companion Guide*, at 16 (Apr. 2013), *available at* http://manuals.momed.com/edb_pdf/D.0%20Companion%20Guide.pdf; New Jersey Medicaid, *D.0/1.2 Payer Sheet*, at 34 (October 2014), *available at* http://www.njmmis.com/downloadDocuments/NJ_D-0_NCPDP_Payer_Sheet.pdf; Molina Medicaid Solutions, Oklahoma Health Care Authority, *NCPDP D.0 Transactions Payer Sheets*, at 13 (Feb. 2011), *available at* https://www.okhca.org/providers.aspx?id=13062& menu=60&parts=7511_7507; TennCare, *TennCare D.0 Payer Specification*, at 9 (Mar. 2013), *available at* http://sites.magellanhealth.com/media/353755/tncpayerspec.pdf.

49.     Many of the states that participate in Medicaid also expressly define the term "usual and customary charge to the general public" (hereinafter referred to as the "usual and customary charge" or "U&C charge") in statutes, rules, and/or program manuals.

### Arkansas

50.     Under the rules governing the Medicaid program of the State of Arkansas, Medicaid pays participating pharmacies "the lower of: (1) The pharmacist's usual and customary charge to the general public for the drug; or (2) The pharmacist's cost of the drug plus a dispensing fee." Ark. Code Ann. § 20-77-403 (2012).

51.     Pharmacies participating in Arkansas' Medicaid Program must bill Medicaid an amount "consistent with the pharmacy's usual and customary charge to the general public," a term that Arkansas Medicaid defines as "the price that is charged for 90% of the prescriptions for private pay customers for the same product and quantity." Pharmacy Medicaid Provider Manual, § II, subsection 251.100 (October 13, 2003), *available at* https://www.medicaid.state.ar.us/ InternetSolution/Provider/docs/pharmacy.aspx#manual.

52.     In Arkansas, "Medicaid Stores may choose the pricing method they desire, and must apply the same pricing formula to prescriptions filed with the Arkansas Medicaid Program that is applied to prescriptions for private pay customers." *Id.* In Arkansas, "Medicaid reimbursement will be based upon the submitted usual and customary billed amount and will be subject to audit verification of the usual and customary price. Stores found in violation of the usual and customary billing provisions will be subject to recoupment of any identified overpayment." *Id.*

53.     In particular, under the rules of the Arkansas Medicaid Program:

> Discrimination against Medicaid beneficiaries is prohibited. No Medicaid beneficiary shall be excluded from any temporary or promotional discount or price reduction available to persons who are not Medicaid beneficiaries. . . . . Amounts billed to the Medicaid Program must be adjusted to reflect temporary or promotional discounts or price reductions irrespective of coupon or card presentation. If it is determined, by audit

or otherwise, that one or more Medicaid beneficiaries was excluded from any temporary or promotional discount or price reduction, the difference between the reduced or discounted price and the price paid will be recouped from the Medicaid provider."

*Id*. § II, subsection 251.101.

### Kansas

54.     Pursuant to the rules of the State of Kansas' Medicaid program, "[i]n no case shall reimbursement for a prescription exceed the lesser of the provider's usual and customary charge for that prescription or the state allowable for that prescription.   The submitted charge and payment for covered over-the-counter pharmacy products shall not exceed the lesser of the product acquisition cost plus the dispensing fee or the usual and customary over-the-counter charge of the pharmacy provider." Kan. Admin. Regs. § 30-5-94 (2013).

### Mississippi

55.     Before April 1, 2012, the rules of the State of Mississippi's Department of Medicaid (DOM) provided that pharmacy "[c]laims must be billed at the usual and customary charge.   DOM does not reimburse claims at more than the usual and customary charge." *See* Provider Policy Manual, Section: Pharmacy, Section 31.04, at 2 (May 1, 2008), *available at* https://web.archive.org/web/ 20120328062742/http://www.medicaid.ms.gov/ProviderManualSection.aspx?Secti on%2031%20-%20Pharmacy.  On April 1, 2012, Mississippi codified its Medicaid rules into Title 23 of its Administrative Code, and codified this policy in doing so.

*See* 23-000 Miss. Code R. § 214(D) (stating that Mississippi Medicaid "does not reimburse claims at more than the usual and customary charge").

56.     Before April 1, 2012, Mississippi Medicaid defined the term "usual and customary charge" as the price charged to "the patient group accounting for the largest number of non-Medicaid prescriptions from the individual pharmacy," excluding patients who purchase or receive their prescriptions through a third party payer (ex: Blue Cross and Blue Shield, Aetna, etc.)."  Provider Policy Manual, *supra*, Section: Pharmacy, Section 31.04, at 2.  Since April 1, 2012, Mississippi has defined "usual and customary charge" as "the price charged to the general public" and defines "the general public" as "the patient group accounting for the largest number of non-Medicaid prescriptions from the individual pharmacy, but does not include patients who purchase or receive their prescriptions through a third party payer." 23-000 Miss. Code R. § 214(D).

### Missouri

57.     Missouri's Medicaid rules provide that providers may not bill, and Medicaid will not reimburse, "in excess of the provider's usual and customary charge for a particular service."  MO HealthNet Provider Manuals, Pharmacy, § 12.2  (Production  -  09/6/2012),  *available at*  http://manuals.momed.com/ collections/collection_pha/print.pdf.

### New Jersey

58.     The Medicaid rules of the State of New Jersey provide that "[t]he maximum charge to the New Jersey Medicaid or NJ FamilyCare program for drugs, including the charge for the cost of medication and the dispensing fee, shall not exceed the provider's usual and customary and/or posted or advertised charge." N.J. Admin. Code 10:51-1.5(c) (2012).

59.     New Jersey Medicaid further specifies that: "[t]he provider shall not charge the programs more than would be charged to a cash customer when the general public, including private third party plans, accounts for more than 50 percent of a provider's total prescription volume." *Id*. § 10:51-1.10(b)(1).

### Oklahoma

60.     The Medicaid Program of the State of Oklahoma ("Sooner Care") requires pharmacies seeking payment to state their "usual and customary to the general public" on submitted claims. Okla. Admin. Code § 317:30-5-78(e). Oklahoma Medicaid will reimburse no more than the pharmacy's "usual and customary charge to the general public." *Id*. § 317:30-5-78(d).

61.     Oklahoma Medicaid defines the term "usual and customary charge to the general public" to be the pharmacy's usual and customary charge to "the patient group accounting for the largest number of non-SoonerCare prescriptions from the individual pharmacy," excluding "patients who purchase or receive their

prescriptions through other third-party payers." *Id.* A pharmacy billing Medicaid must provide Medicaid with any discounted prices it makes available to the general public when the "patients receiving the favorable prices represent more than 50% of the pharmacy's prescription volume." *Id.*

### Tennessee

62.     The State of Tennessee's Managed Medicaid Program ("TennCare") requires providers to bill and TennCare to pay no more than "usual and customary." TennCare Pharmacy Manual, Version 4.0, at 39 (February 2013), *available        at*        https://tnm.providerportal.sxc.com/rxclaim/TNM/ TennCarePharmacyManual.pdf. The TennCare Payer Specification Sheet requires that pharmacy providers input their "usual and customary" charge when submitting claims. *Id.* at 45. Effective January 1, 2006, the TennCare provider participation agreement for ambulatory and long-term care pharmacy providers stated that TennCare would not pay more than the "usual and customary charge to the general public." TennCare Pharmacy Agreement, Attachment A, *available at* http://sites.magellanhealth.com/media/353761/tncambulatoryagreement.pdf. The agreement defines "customary charge" as "[t]he reasonable, usual and customary fees charged by Pharmacy which do not exceed the fees Pharmacy would charge any other person regardless of whether the person is a TennCare enrollee." *Id.* at Section 1.27.

## The Medicare Part D Prescription Drug Benefit

63.     To meet the prescription drug needs of Medicare enrollees, in 2003, Congress passed the Medicare Prescription Drug, Improvement, and Modernization Act ("MMA"). Pub. L. 108-173, 117 Stat. 2066 (2003). The MMA established a voluntary prescription drug benefit program known as Medicare Part D available to those eligible for Medicare, i.e., those 65 years and older, the disabled and those with End Stage Renal Disease, who are willing to pay premium payments, co-insurance or co-payments, and accept other terms of the plan. To deliver Part D benefits to Medicare enrollees, CMS contracts with private insurance companies known as Part D Plan Sponsors ("Part D Sponsors"), which in turn offer enrollees a choice of prescription drug benefit plans. These plans must meet minimum standards set by CMS. See 42 U.S.C. § 1395w-102; 42 C.F.R. § 423.104.

64.     To receive payment from CMS, a Part D Sponsor must agree to give the Part D enrollees access to "negotiated prices" for covered drugs – that is, the prices that the Plan Sponsors negotiate with providing pharmacies. 42 U.S.C. § 1395w-102(a)(1); see 42 C.F.R. § 423.100 (defining "negotiated prices"). CMS considers the Plan Sponsor's commitment to provide such access material to CMS's decision to make payment to the Part D Sponsor. Providing enrollees with access to negotiated prices ensures that both the taxpayers that fund Medicare and

the enrollees who pay deductibles, co-pays, co-insurance and full payments while in the coverage "donut hole," will reap the benefit of the Part D Sponsors' enhanced bargaining power.

65.    To fund the Part D prescription drug benefit, CMS pays a Part D Sponsor a per-enrollee subsidy (paid monthly) based on a bid submitted by the Part D Sponsor the previous year that reflected the Part D Sponsor's anticipated costs. 42 C.F.R. § 423.329(a). This direct subsidy is risk-adjusted to account for the health status of the particular Part D Sponsor's enrollees. 42 C.F.R. § 423.329(b). To provide Part D Sponsors with further protection against annual cost fluctuations, Part D also includes a risk-sharing mechanism (known as the "risk corridors") under which CMS will partially reimburse a Part D Sponsor if its actual costs exceed its anticipated costs by a specified percentage. *See* 42 C.F.R. § 423.336. Similarly, CMS provides additional funding to "reinsure" Part D Sponsors for prescription drug costs incurred after an enrollee reaches a specified threshold of out-of-pocket expenses (known as the "catastrophic" threshold). 42 C.F.R. § 423.329(c). And CMS provides further payments to subsidize costs incurred by certain low-income enrollees. 42 C.F.R. § 423.329(d). Thus, CMS's monthly subsidy payments may include a combination of reinsurance payments, low-income enrollee subsidies, and risk-sharing payments on top of the direct per-enrollee subsidy.

66.     At the end of each year, CMS "reconciles" the Part D Sponsor's actual allowable costs against the monthly subsidy payments to determine whether it must make further risk sharing, low-income subsidy, or reinsurance payments; or, conversely, whether the Part D Sponsor owes money to CMS. 42 C.F.R. §§ 423.329(c), 423.343. To calculate whether it must make these additional payments, CMS needs information about every drug claim submitted to the Part D Sponsor by pharmacies, either directly or through a Pharmacy Benefit Manager (PBM) or other intermediary 42 C.F.R. §§ 423.329(c)(2)(ii), 423.336(c); *see also* Final Rule, Medicare Prescription Drug Benefit, 70 Fed. Reg. 4,194, 4,307 (Jan. 28, 2005).

67.     As a condition of receiving Part D funds, a Part D Sponsor must agree to comply with the applicable requirements and standards and the terms and conditions of payment governing the Part D program. *See* 42 U.S.C. § 1395w-112. In particular, the Sponsor must agree to provide CMS with the information it requires to administer the program, 42 C.F.R. § 423.322(a), to comply with all federal laws and regulations designed to prevent fraud, waste, and abuse. 42 C.F.R. § 423.505(h)(1), and, to require that the pharmacies in their networks agree: to perform services in a manner that is consistent with and complies with the Part D Sponsors' contractual obligations; to comply with all applicable federal laws, regulations, and CMS instructions; and, to comply with all federal laws and

regulations designed to prevent fraud, waste, and abuse. 42 C.F.R. § 423.505(i)(4)(iii)–(iv).

68. To submit claims for drugs dispensed to Medicare enrollees under Medicare Part D, a pharmacy must individually contract with a Part D Sponsor that provides Part D benefits, or an intermediary organization. A pharmacy that enters one of these contracts is known as a "network pharmacy." *See* 42 C.F.R. § 423.100 (defining "network pharmacy"). When entering into these contracts, Part D Sponsors negotiate the prices that network pharmacies will be paid for covered drugs dispensed to their enrollees. *See id.* (defining "negotiated price" as the price that "[t]he Part D sponsor (or other intermediary contracting organization) and the network dispensing pharmacy or other network dispensing provider have negotiated as the amount such network entity will receive, in total, for a particular drug").

69. When negotiating these contracts, Part D Sponsors typically require the inclusion of "Usual and Customary" pricing clauses that prohibit network pharmacies from charging the Sponsor more for a covered drug than they would charge a cash-paying customer with no insurance coverage. Through these bargained-for Usual and Customary clause, a network pharmacy's Usual and Customary prices are incorporated into the negotiated prices that CMS requires the Part D Sponsors to make available to their enrollees.

70.   Network pharmacies that submit claims to Part D Plan Sponsors must certify to the accuracy, completeness, and truthfulness of that data and acknowledge that they will be used to seek federal funds. 42 C.F.R. § 423.505(k).

71.   Network pharmacies must use the NCPCD format to submit their charges to Part D Sponsors.  See 42 U.S.C. § 1320d-4(b) (mandating compliance with transaction standards set by HHS); 45 C.F.R. § 162.1102(a)-(c) (adopting the NCPDP standard as the standard for retail pharmacy electronic drug claims).

72.   Federal law prohibits entities from "submitt[ing] or caus[ing] to be submitted bills or requests for payment" under the Medicare program for items or services "furnished substantially in excess of such . . . entity's usual charges . . . for such items or services." 42 U.S.C. § 1320a-7(b)(6).  Entities that do so may be excluded from the federal healthcare programs. *Id.*

73.   Moreover, any "health care practitioner and any other person (including a hospital or other health care facility, organization, or agency)" that provides health care services for which payment may be made "in whole or in part" under the Medicare act is required to "assure . . . that services or items ordered or provided" will be provided "economically." 42 U.S.C. § 1320c-5(a)(1).

## Reporting and Refunding Overpayments to Medicare and Medicaid

74.   The Social Security Act imposes an affirmative duty on health care providers who bill Medicare or Medicaid to disclose any Medicare or Medicaid

overpayments they identify to the government health care program within 60 days of discovery, or, in the case of providers who submit cost reports (pharmacies do not do so), by the deadline for submission of their cost report. 42 U.S.C. § 1320a-7k(d). This statute expressly states that the duty it imposes is an obligation as that term is used in Section 3729(b)(3) of the federal False Claims Act. *Id.* § 1320a-7k(d)(3).

## THE FRAUDULENT SCHEME

### The False Claims Submitted to Medicaid

75.    In or about 2008, Defendants Stephen L. LaFrance, Jr., Jason LaFrance, and the Defendant LaFrance affiliates that they controlled and operated as a single enterprise that did business as "USA Drug" (the LaFrance Defendants and the LaFrance affiliates are collectively referred to hereinafter as "USA Drug"), began requiring the USA Drug pharmacies to offer hundreds of generic medications to customers paying with cash rather than insurance at $4 for a 30-day supply and $10 for a 90-day supply (these practices collectively will be referred to herein as "$4 generic pricing"). The Defendants did this to meet competition from Wal-Mart Stores, Inc. ("WalMart"). In the third quarter of calendar year 2006, WalMart's pharmacies throughout the nation had launched a program that provided customers with $4 pricing for a 30-day supply of any one of more than 300 commonly-prescribed generic medications. In conversations with a WalMart

pharmacy manager at the time of the implementation of the $4 pricing program, Relator asked if WalMart would be charging Medicaid and other third-party programs the same $4 pricing for the medications included in the program. The pharmacy manager for WalMart replied WalMart would be charging the $4 price, which it did and continues to do in compliance with Medicaid's Usual and Customary charge requirement.   In subsequent years, WalMart expanded the program so that it also offered customers $10 pricing for a 90-day supply of many of these generic medications, and discounted pricing for yet additional generic drugs.   WalMart made these same low prices available to Medicaid, charging Medicaid beneficiaries as well as cash-paying customers $4 for a 30 day supply and $10 for a 90 day of the medications that were part of its program.   Exhibit B contains copies of WalMart brochures dated October 17, 2006, January 17, 2007, March 24, 2009, January 13, 2010, June 25, 2010, June 30, 2011, March 2, 2012, and April 4, 2013, that list the several hundred medications that WalMart's pharmacies have included in their $4 generic pricing program between 2006 and the present time.   (These brochures are collectively referred to herein at "the WalMart list.") The Defendants matched the pricing of the Wal-Mart program, but only for cash-paying customers.  They did not make these low prices available to Medicaid, in contrast to WalMart and some of the other retail pharmacy chains. From the fall of 2008 through at least September 2012, the Defendants have

offered cash-paying customers $4 pricing for a 30-day supply, and $10 day pricing for a 90-day or 100-day supply, on the same generic medications as listed in the Wal-Mart list in effect at the time.

76.   At some USA Drug pharmacies, including Relator's former pharmacies in Linn, Missouri and Sullivan, Missouri, the company rolled out the $4 generic pricing by offering it to any cash-paying customer who brought a receipt from another pharmacy showing that they had been offered $4 generic pricing at the other store.

77.   USA Drug soon abandoned that approach, however, as management concluded it didn't make sense to invite customers to shop elsewhere first.  Instead, by the fall of 2008, USA Drug's management began requiring all of the USA Drug pharmacies to offer the $4 generic pricing to any cash-paying customer who requested it, without requiring enrollment in a program or payment of any type of fee.  As a practical matter, the USA Drug pharmacies generated the $4 generic pricing for a cash-paying customer even without the customer's request.  Once a customer had requested this pricing for a particular prescription, the pharmacy staff generally made a note in the patient's file to ensure that the customer received the $4 generic pricing on all eligible generic drug prescriptions from that point forward.

78.   USA Drug marketed its $4 generic pricing by notifying physicians' offices that USA Drug pharmacies offered this pricing.   To get the word out beyond doctors and their patients, the company relied on pharmacy staff and communications amongst the pharmacies' customers.

79.   For almost all medications on the WalMart list, by USA Drug's 2009-2010 fiscal year (July 1, 2009-June 30, 2010), a majority of USA Drug's transactions with non-insured patients were made at $4 generic pricing.   Indeed, for many of these drugs, by this point in time, more than 90% of USA Drug's transactions with non-insured customers were made at $4 generic pricing.   During the next two fiscal years, even larger percentages of USA Drug's transactions with cash paying customers for these medications were made at $4 generic pricing.

80.   The following chart reflects all USA Drug transactions with non-insured customers and Medicaid for several popular generic drugs at the Strauser Drugs store during the USA Drug fiscal year July 1, 2009 through June 30, 2010, the first year in which $4 generic pricing was implemented at this store.   During subsequent periods of time, increasingly higher percentages of cash pay transactions were subject to $4 generic pricing:

| Drug | # Cash Pay Transactions | % Cash Pay Transactions at $4 or Below | Amounts Charged Medicaid |
|---|---|---|---|
| 20 Ciprofloxacin 500MG tablets | 17 | 76.5% | $121.95, $117.59, $113.74, $82.41, $19.43 |
| 30 Fluoxetine 40MG capsules | 25 | 76.0% | $172.24 |
| 30 Fluoxetine 20MG capsules | 30 | 93.3% | $88.52 |
| 30 Furosemide 20MG tablets | 10 | 90.0% | $9.99, $9.89 |
| 30 Furosemide 40MG tablets | 25 | 80.0% | $10.26, $10.69 |
| 30 Loratadine 10MG tablets | 211 | 81.0% | $31.60, $23.69, $18.42, $14.92, $14.24 |
| 30 Metoprolol 50MG tablets | 11 | 81.8% | $22.59 |
| 60 Metformin 500MG ER tablets | 12 | 100.0% | $52.24 |
| 60 Metoprolol 50MG tablets | 57 | 86.0% | $39.71 |

| Drug | # Cash Pay Transactions | % Cash Pay Transactions at $4 or Below | Amounts Charged Medicaid |
|---|---|---|---|
| 60 Naproxen 500MG tablets | 13 | 84.6% | $77.31, $78.05 |
| 60 Ranitidine 150MG tablets | 93 | 69.9% | $173.42, $174.35, $174.67, $174.99, $107.99, $107.18 |

81.     Throughout the period between the Fall of 2008 and Walgreen's September 2012 purchase of USA Drug, USA Drug management supplied the USA Drug pharmacies with a billing software program developed by Computer Rx of Oklahoma City, Oklahoma. USA Drug's corporate headquarters inputted parameters into this program that established a single price for every drug that management characterized as the "Usual & Customary price." This price was determined by corporate headquarters based on their assessment as to what amount would always equal or exceed the maximum possible reimbursement for the drug from government payers such as Medicaid, Medicare Part D and other third-party payers. USA Drug's corporate headquarters instructed the pharmacies that they should override this pricing with $4 generic pricing for all cash-paying customers requesting the $4 pricing.

82.     To facilitate the ability of its pharmacists to override retail pricing with $4 generic pricing for cash-paying customers, USA Drug's Computer Rx computer systems were regularly updated with WalMart's current list of generic medications with $4 generic pricing.   Whenever pharmacy staff accessed the computer screens that came up during the billing process, such as the screen in the billing software that provided information on USA Drug's price for a generic drug product – a screen called the "Prescription Quote" screen, the billing software would inform the pharmacist or technician if the generic drug was on the WalMart $4 generic pricing list.   Pursuant to USA Drug policy, if a generic drug was on the WalMart list, the pharmacist was then supposed to manually override the retail price that automatically appeared in the price field in the billing software with the much lower $4 generic price.   While this manual override practice was cumbersome, over time, USA Drug's pharmacists and pharmacy technicians became adept at routinely carrying out the override when selling generic drugs on the WalMart list to cash paying customers.   Some pharmacies kept a paper copy of the WalMart list handy so they could readily determine whether any given generic drug was on the list.

83.     In compliance with directions from management, Relator, when he was a pharmacist employed by USA Drug, offered $4 generic pricing to non-insured customers at the stores in Linn, Missouri, and Sullivan, Missouri, that he

had previously owned. He repeatedly, however, expressed to USA Drug management his concern that USA Drug's failure to offer the $4 generic pricing to Medicaid would expose the company to potential liability if the company's pharmacies were to be audited.

84. Relator further noted to management that USA Drug also could face significant liability if it charged non-government, third-party insurers such as pharmacy benefit managers (PBMs) more than $4 generic pricing on days on which it offered the same medication to cash paying customers at $4 generic pricing.

85. At the direction of USA Drug, Relator's former pharmacies in Linn, Missouri, and Sullivan, Missouri, as well as the other USA Drug stores, continued to offer $4 generic pricing through the date of the acquisition by Walgreen.

86. After Walgreen acquired ownership and control of LaFrance Pharmacy and certain of the LaFrance affiliates in September 2012, Walgreen, with actual knowledge of the USA Drug $4 generic pricing program, allowed the USA Drug pharmacies for a period of time to continue to utilize $4 generic pricing for cash-paying customers without making this pricing available to Medicare Part D and Medicaid. Walgreen's management directed the USA Drug stores that they would have to discontinue the $4 generic pricing for cash customers when the pharmacies' computer systems were converted to new systems used by Walgreen's

stores.  In the Strauser Drugs pharmacy, on March 20, 2013, Relator advised Pam

Marshall, a Walgreen Pharmacy Supervisor who oversees numerous stores, that the

$4 prescription plan, as implemented by USA Drug and continued by Walgreen,

was illegal.  Relator told her he would be glad to see it end.

87.    Through its ownership and control of LaFrance Pharmacy and certain

of the LaFrance affiliates, Walgreen also unlawfully retained, and caused LaFrance

Pharmacy and these LaFrance affiliates to unlawfully retain, the overpayments the

USA Drug pharmacies had received from Medicare Part D, Medicaid and other

Government Health Plans as a result of their failure to offer $4 generic pricing to

third party payers.  These overpayments were identified by and known to all of the

Defendants.  In doing so, Walgreen not only violated 42 U.S.C. § 1320a-7k(d), the

federal False Claims Act and the state false claims laws under which Relator sues,

it also violated a Corporate Integrity Agreement (CIA) entered into between the

HHS-OIG and Walgreen on June 2, 2008.  That CIA, which was in effect through

June 1, 2013, and applied to "[e]ach newly . . . purchased . . . retail pharmacy

location," required that Walgreen report any identified overpayment to Medicare or

Medicaid within 30 days and report any identified "substantial overpayment" to the

HHS-OIG within 60 days.

88.    On April 5 and 6, 2013, representatives of USA Drug stores in

Arkansas, Mississippi, Oklahoma, Tennessee, confirmed to Relator that these USA

Drug stores likewise continued their $4 generic pricing through their acquisition by Walgreen, with each store either terminating this pricing soon after the Walgreen acquisition or planning to do so in the near future once Walgreen took over store operations. Thus:

- On April 5, 2013, at 6:55 p.m. C.D.T., Relator spoke with "Stan," a pharmacy technician at Drug Warehouse, at 591 S. Mill Street, Pryor, Oklahoma 74361. Stan informed Relator that his drugstore would continue the $4 generic pricing for two more weeks, until Walgreen took over store operations.

- On April 6, 2013, at 8:58 a.m. C.D.T., Relator spoke with "Lita," a pharmacy technician at USA Drug – USA Drug Express, at 1919 W. Main Street, Ashdown, Arkansas, 71822. Lita informed Relator that her store participates in the $4 generic pricing match with Wal-Mart, but that it would end on May 9, 2013, when Walgreen took over.

- On April 6, 2013, at 9:02 a.m. C.D.T., Relator spoke with a pharmacy technician at USA Drug – Super D Drugs, at 6068 S. First Street, Milan, Tennessee. 38358. The technician informed Relator that her store had participated in the $4 generic pricing match with Wal-Mart through Walgreen's purchase of USA Drug, but that it no longer did

so. She said her store had just recently stopped offering $4 generic pricing.

- On April 6, 2013, at 9:05 a.m. C.D.T., Relator spoke with "Brianna," a pharmacy technician at USA Drug – Super D Drugs, at 200 Marion Avenue, McComb, Mississippi, 39648.  Brianna informed Relator that her store ceased offering $4 generic pricing about a month ago– *i.e.*, in March 2013.

89.    Pursuant to instructions from corporate headquarters, the USA Drug pharmacies ordinarily did not advertise the $4 generic pricing in the media or use brochures, signs, or other promotional material to advertise the $4 generic pricing within their stores.

90.    USA Drug pharmacies misrepresented their "usual and customary charge to the general public" when submitting invoices for generic medications on the WalMart list to Medicaid.  When submitting such invoices, even though specifically required by Medicaid to bill their "usual and customary charge to the general public" and to disclose this amount on claims forms, the USA Drug pharmacies did not charge or disclose the $4 pricing.  On the contrary, USA Drug's pharmacies routinely falsely informed Medicaid that their "usual and customary charge" for these drugs was the rate set by corporate management for all third-party sales – a rate that was rarely, if ever, actually charged to cash-paying

customers or paid by non-government third parties, and that almost always significantly exceeded the $4 generic pricing given to cash-paying customers.  In addition, in violation of Medicaid billing rules, USA Drug's pharmacies routinely charged Medicaid amounts for generic drugs on the WalMart list that exceeded the pharmacies' "usual and customary charge to the general public" in order to obtain payment at higher levels than that to which they were entitled.

91.    USA Drug pharmacies also misrepresented their "usual and customary charge to the general public" when billing Medicare Part D for generic drugs on the WalMart list.  While working at USA Drug, Relator recalls consistently seeing provisions in contracts between USA Drug and PBMs, such as Express Scripts, Caremark, Wellpoint, Pacificare, PCS and Medco, that required USA Drug stores to charge no more than their "usual and customary charge" when billing Medicare Part D.    When billing the Part D plans for these generic drugs, the USA Drug pharmacies submitted claims using the NCPDP format, including the field that requested their "usual and customary charge to the general public."  In this field, the USA Drug pharmacies falsely included an amount that exceeded the $4 generic pricing available to cash customers, thereby charging an amount that was in excess of the stores' true "usual and customary charge."

92.    As a result of their false representations to PBMs and other entities administering Medicare Part D benefits concerning their "usual and customary

charge to the general public," the USA Drug pharmacies submitted false claims. When the PBMs and other entities paid these false claims, they used funding that had been provided by the United States or would be reimbursed by the United States for the purpose of furthering the Government's Medicare Part D program.

93.   As a result of their false representations to PBMs and other entities administering Medicare Part D benefits concerning their "usual and customary charge to the general public," the USA Drug pharmacies also caused the Part D Sponsors to submit false claims to the United States.  The Sponsors' claims to the United States were false because the Sponsors unwittingly were in violation of a material condition of United States' funding of the Sponsors, that being that the Sponsors: i) negotiate prices with network pharmacies that did not significant exceed the pharmacies "usual and customary prices to the general public," and, then ii) make the negotiated pricing available to Part D enrollees.

## Specific Examples of Knowing, False Claims

94.   The following are examples of instances in which a USA Drug pharmacy submitted false claims to Medicaid or Medicare Part D by submitting a charge on the claim form to Medicaid or the Part D sponsor that the pharmacy identified as the pharmacy's "usual and customary charge" despite the fact that this amount, in actuality, exceeded the pharmacy's true usual and customary charge:

- During the month of January 2012, USA Drug's pharmacy Strauser Drugs in Sullivan, Missouri, entered into the following transactions involving 30 capsules of the antibiotic Amoxicillin 500 mg:

  o Eleven sales to cash-paying customers, with US Drug charging each and every such customer $4 and accepting $4 in reimbursement. These 11 transactions took place on January 3, 2012 (two transactions), January 5, 2012 (one transaction), January 6, 2012 (one transaction), January 9, 2012 (one transaction), January 10, 2012 (one transaction), January 12, 2012 (one transaction), January 13, 2012 (one transaction), January 17, 2012 (one transaction), January 19, 2012 (one transaction), and January 26, 2012 (one transaction).

  o Seven sales to customers covered by private health insurance in which USA Drug accepted as full reimbursement the following amounts: $10.08, $10.00 (in two instances), $8.00, $7.15, $6.04, and $5.39. These seven transactions took place on January 3, 5, 10, 11, and 18, 2012, respectively.

  o Two sales to Medicare Part D-Pacificare beneficiaries, on January 3 and 24, 2012, in which USA Drug charged $21.05

and $15.49, respectively, and obtained $5.10 in total reimbursement in each instance.

o One sale to Medicare Part D Missouri-Senior Rx, the Missouri Medicaid program that pays as secondary payer when a beneficiary has primary coverage from Medicare Part D, on January 3, 2012, in which USA Drug charged $15.49 and was reimbursed $7.65 in full. (Although Mo-Senior Rx was renamed "MoRx" in 2006, USA Drug's billing software continued to use the program's prior name, "Mo Senior Rx.")

o Five sales to Missouri Medicaid beneficiaries, in which USA Drug charged $21.05 and was reimbursed $17.24 or $17.74 in each such instance. These transactions took place on January 2, 2012 (one transaction), January 3, 2012 (two transactions), January 14, 2012 (one transaction) and January 17, 2012 (two transactions).

- During the month of January 2012, USA Drug's pharmacy Strauser Drugs in Sullivan, Missouri, entered into the following transactions involving 30 tablets of Cyclobenzaprine 10 mg. ( a muscle relaxant):

o Five sales to cash-paying customers, with USA Drug charging four of these customers $4 and accepting $4 in reimbursement,

and charging the remaining customer $18.34 and accepting that amount in reimbursement.  These five transactions took place on January 6, 2012, January 9, 2012, January 10, 2012, January 11, 2012, and January 27, 2012.

o    Fourteen sales to customers covered by private health insurance in which USA Drug accepted as full reimbursement the following amounts:  $3.22 (three times), $3.42 (two times), $4.56 (one time), $5.00 (one time), $5.39 (one time), $5.45 (two times), $6.66 (one time),  $7.46 (one time), and $10.00 (two times).  These 14 transactions took place on January 6 (one transaction), 7 (one transaction), 9 (one transaction), 10 (one transaction), 14 (one transaction), 18 (two transactions), 23 (three transactions), 25 (one transaction), and 27 (three transactions), 2012, respectively.

o    Three sales to Medicare Part D Missouri-Senior RX (MoRX Plan), on January, 4, 16, and 31, 2012, in which USA Drug charged $38.83 and was reimbursed in full $4.32 (January 4), $5.25 (on January 16) and $4.92 (on January 31).

o    Nine sales to Missouri Medicaid beneficiaries, in which USA Drug charged $38.83 and was reimbursed $15.18 in each such

instance.  These transactions took place on January 5, 9, 10, 11, 14, 18, 25, 30 and 31.

95.     The following are additional examples drawn from Strauser Drugs' transactions during January 2012 that again illustrate the Defendants' pervasive overbilling of Medicaid for generic drugs:

- During the month of January 2012, Strauser Drugs on a total of 10 occasions sold a 30-day supply of the antidepressant Citalopram 40 mg to a customer paying with cash rather than insurance.  On each such occasion, Strauser Drugs charged and accepted as payment $4. During the same month, Strauser Drugs billed Missouri Medicaid 13 times and Medicare Part D Missouri Senior Rx (MoRX Plan) 14 times for a 30-day supply of Citalopram 40 mg., each time charging $79.64 and receiving as payment either $15.57 or $16.53 from Missouri Medicaid, or an amount that ranged between $4.44 and $9.25 from Medicare Part D Missouri Senior Rx (MoRX Plan).  Strauser Drugs also billed Medicare Part D Humana Rx Drug Plan once, charging $79.64 and receiving $6.01 in total payments; Medicare Part D Pacificare once, charging $79.64 and receiving $9.55 in total payments; and Medicare Part D Elder Health PDP TX once, charging $79.64 and receiving $8.65 in total payments.

- During the month of January 2012, Strauser Drugs on a total of four occasions sold a 30-day supply of the anti-cholesterol drug Lovastatin 20 mg to a customer paying with cash rather than insurance. On each such occasion, Strauser Drugs charged and accepted as payment $4. During the same month, Strauser Drugs billed Missouri Medicaid two times, and Medicare Part D Missouri Senior Rx (MoRX Plan) three times, for a 30-day supply of Lovastatin 20 mg., each time charging $72.87 and receiving as payment $17.34 from Missouri Medicaid, and $6.43, $8.88 or $15.91 from Medicare Part D Missouri Senior Rx (MoRX Plan). Strauser Drugs also billed Medicare Part D Pacificare 5 times, each time charging $72.87 and receiving $9.18 in total payment.

- During the month of January 2012, Strauser Drugs on a total of seven occasions sold a 30-day supply of the anti-cholesterol drug Pravastatin 20 mg to a customer paying with cash rather than insurance. On each such occasion, Strauser Drugs charged and accepted as payment $4. During the same month, Strauser Drugs billed Missouri Medicaid five times and Medicare Part D Missouri Senior Rx (MoRX Plan) two times for a 30-day supply of Pravastatin 20 mg., each time charging $97.34 and receiving as payment $16.67 from Missouri Medicaid, or

$9.60 or $12.17 from Medicare Part D Missouri Senior Rx (MoRX Plan).

- During the month of January 2012, Strauser Drug on a total of three occasions sold a 30-day supply of the anti-depressant drug Fluoxetine 40 mg to a customer paying with cash rather than insurance. On each such occasion, Strauser Drugs charged and accepted as payment $4. During the same month, Strauser Drugs billed Missouri Medicaid four times and Medicare Part D Missouri Senior Rx (MoRX Plan) five times for a 30-day supply of Fluoxetine 40 mg., each time charging $154.96 and receiving as payment $16.67 from Missouri Medicaid, and amounts between $10.36 and $25.92 from Medicare Part D Missouri Senior Rx (MoRX Plan).

- During the month of January 2012, Strauser Drug on one occasion sold a 30-day supply of the anti-depressant drug Fluoxetine 20 mg to a customer paying with cash rather than insurance. On that occasion, Strauser Drugs charged and accepted as payment $4. During the same month, Strauser Drug billed Missouri Medicaid 6 times for a 30-day supply of Fluoxetine 20 mg, each time charging $78.90 and receiving as payment $15.29. During the same month, Strauser Drugs billed Medicare Part D Missouri Senior Rx (MoRX Plan) two times for a 30-

day supply of Fluoxetine 20 mg, each time charging $78.90 and receiving as payment $5.79 Medicare Part D Missouri Senior Rx (MoRX Plan). And during the same month, Strauser Drugs billed Medicare Part D Pacificare 2 times for a 30-day supply of Fluoxetine 20 mg, each time charging $78.90 and receiving as payment $5.35 on one occasion and $5.54 on the other.

- During the month of January 2012, Strauser Drug on a total of eight occasions sold a 30-day supply of the thyroid hormone supplement Levothyroxine 75 mcg to a customer paying with cash rather than insurance. On each such occasion, Strauser Drugs charged and accepted as payment $4. During the same month, Strauser Drug billed Missouri Medicaid 10 times for a 30-day supply of Levothyroxine 75 mcg., each time charging $17.16 and receiving as payment $14.18. Strauser Drugs also billed Medicare Part D Pacificare three times, each time charging $17.88 and receiving $7.10 in total payment.

- During the month of January 2012, Strauser Drug, on a total of 14 occasions sold a 30-day supply of the blood pressure medication Lisinopril 10 mg to a customer paying with cash rather than insurance. On each such occasion, Strauser Drugs charged and accepted as

payment $4. During the same month, Strauser Drugs billed Missouri Medicaid nine times for a 30-day supply of Lisinopril 10 mg, each time charging $36.48 and receiving as payment $14.51 from Missouri Medicaid. Strauser Drugs also billed Medicare Part D Pacificare ten times, each time charging $36.48 and receiving $6.98 in total payment.

- During the month of January 2012, Strauser Drugs on a total of 10 occasions sold a 30-day supply of the diabetes drug Metformin 1000 mg to a customer paying with cash rather than insurance. On each such occasion, Strauser Drugs charged and accepted as payment $4. During the same month, Strauser Drugs billed Missouri Medicaid four times and Medicare Part D Missouri Senior Rx (MoRX Plan) 13 times for a 30-day supply of Metformin 1000 mg. Each time the pharmacy billed Medicaid, it charged $86.10 and was reimbursed either $13.72 or $16.90. When the pharmacy billed Medicare Part D Missouri Senior Rx (MoRX Plan), in 11 of the 13 instances, it billed $86.10 and was reimbursed amounts between $4.20 and $13.75. In the remaining two instances, it billed $18.43 and was reimbursed $13.75. Strauser Drugs also billed Medicare Part D Pacificare four times, each time charging $86.10 and receiving $6.00 in total payments; and Medicare

Part D Elder Health PDP TX one time, charging $86.10 and receiving $12.69 in total payment.

### Relator's Discovery of and Objections to the Illegal Billing Activity

96.    Relator first learned that USA Drug planned to implement $4 generic pricing at USA Drug pharmacies to match Wal-Mart's pricing in conversations in 2008 with Defendants Stephen LaFrance, Jr. and Jason LaFrance, and with Joe Courtright, Chief Executive Officer of USA Drug; Kelly Barnes, District Manager for Jarco, Inc. and Daleco, Inc.; and Tiffany Letson, Acquisitions, USA Drug.  In multiple conversations, each of these individuals informed Relator that USA Drug pharmacies would be charging cash-paying customers the same $4 generic pricing as did Wal-Mart as part of the USA Drug company policy to match the prices of its competitors.  These conversations took place as part of the negotiations between Relator and the LaFrance defendants to sell his pharmacies to Jarco, Inc., one of the LaFrance affiliates.  While Relator was on vacation, the LaFrance Defendants, through District Manager Kelly Barnes, directed store manager Jari Dawson to implement the $4 generic pricing for cash customers at the two drug stores that Relator previously owned in Sullivan, Missouri, and Linn, Missouri.  Shortly after this, Relator asked Dawson to find out if the USA Drug pharmacies, including his former stores, would also utilize the $4 generic pricing when billing Medicaid and other third-party insurers.    Dawson told Relator that Kelly Barnes, District

Manager for Jarco, Inc. and Daleco, Inc., had told her that they would <u>not</u> be doing so. Instead, USA Drug would charge these lower prices to cash paying customers, thereby establishing the $4 pricing as its new "usual and customary charge," while continuing to bill higher amounts to third- party insurers such as Medicaid in direct contravention of law and contractual agreements. Relator had independent access to the billing systems of several other USA Drug pharmacies in Missouri, and he confirmed through his review of the prescription sales data that these USA Drug pharmacies were not providing the $4 generic pricing to Medicaid.

97.    In 2008, and repeatedly thereafter, Relator was informed by USA Drug's management that the chain was implementing $4 generic pricing not only at Relator's former drug stores in Missouri, but at all the USA Drug pharmacies in the nation.   He learned it through the discussions referenced in Paragraph 70, *supra*, and through subsequent communications with Stephen LaFrance, Jr., Jason LaFrance, Joe Courtright, Kelly Barnes, and Jari Dawson.

98.    Upon learning of USA Drug's implementation of $4 generic pricing for cash paying customers but not for Medicaid, Relator expressed his objections to this practice in communications with Defendants Stephen LaFrance, Jr., and Jason LaFrance, and with Joe Courtright, and Kelly Barnes, noting, among other things, that implementation of such pricing for cash customers without making the same

pricing available for Medicaid would be illegal and would expose the USA Drug pharmacies to liability if audited by Medicaid or other third-party plans.

99.     In response to Relator's statements of his concerns regarding USA Drug's failure to make the $4 generic pricing available to Medicaid, in or about March or April 2009, USA Drug CEO Joe Courtright defended USA Drug's decision by informing Relator that the Medicaid programs in the states in which the USA Drug does business have not been auditing pharmacies' compliance with Medicaid's "usual and customary charge" billing rule.   Since April 2009, Courtright has been a Director of the National Association of Chain Drug Stores, an organization located in Washington, D.C., that, among other things, "presents programs and services to assist chain pharmacies in complying with the law." (*See* http://www.nacds.org/advocate/legalcompliance.aspx.)

100.   Relator also frequently expressed his view that USA Drug's $4 generic pricing is fraudulent in conversations with Strauser Drug pharmacists Shelley Jannings, Mary Howard, and Christie Starr.  Relator told them he would be glad to see the program end upon Walgreen's acquisition of the pharmacy business from Defendant LaFrance Holdings.  In frequent conversations with Jari Dawson, the former controller of Relator's former pharmacy company, Meramec Pharmacy, Inc. – conversations that have taken place from the initiation of the $4 special savings plan until the present time –Relator has expressed his concerns that the

LaFrance Defendants' implementation of $4 generic pricing would not be legal unless such pricing were also made available to Medicaid and other insurance companies. Relator has told Dawson he believes USA Drug has committed a fraud through these activities and has accumulated a tremendous potential liability

101. Through the foregoing conduct, the Defendants knowingly have submitted and/or caused the submissions of false claims that have caused the federal-state Medicaid program, in each state in which the USA Drug pharmacies do business, as well as Medicare Part D and other Government Health Plans, to pay excessive amounts for many of the generic medications listed on the brochure in Exhibit B. The federal-state Medicaid programs have been damaged by the difference between what they actually paid USA Drug pharmacies for the generic medications that are part of the Wal-Mart Stores, Inc. Program and what they would have paid if USA Drug had made its $4 generic pricing available to Medicaid beneficiaries. The United States Medicare Part D has been damaged in an amount equal to the additional sums it paid and reimbursed Part D Sponsors as a result of the USA Drug pharmacies failing to make $4 pricing available to Medicare Part D beneficiaries.

102. Through the foregoing conduct, the Defendants have knowingly and improperly avoided an obligation to repay funds owed the United States and the state Plaintiffs, by improperly failing to disclose and return overpayments. The

United States and the state Plaintiffs have been damaged by the difference between their payments to the USA Drug pharmacies for the generic medications that are part of the Wal-Mart Stores, Inc. Program and the $4 generic pricing.

## COUNT I

### (Federal False Claims Act, 31 U.S.C. § 3729(a))

103.   This is a civil action by Plaintiff J. Douglas Strauser, acting on behalf of and in the name of the United States, against the Defendants under the False Claims Act.

104.   Plaintiff realleges and incorporates by reference paragraphs 1 through 102 as though fully set forth herein.

105.   The Defendants knowingly have presented or have caused to be presented false or fraudulent claims for payment by the United States, in violation of 31 U.S.C. § 3729(a)(1)(A) (post-May 2009 amendment) and 31 U.S.C. § 3729(a)(1) (pre-May 2009 amendment).

106.   The Defendants knowingly have made or used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States, in violation of 31 U.S.C. § 3729(a)(1)(B) (post-May 2009 amendment) and 31 U.S.C. § 3729(a)(2) (pre-May 2009 amendment).

107.   The Defendants have knowingly and improperly avoided obligations to pay or transmit money to the Government, in violation of 31 U.S.C. § 3729 (a)(1)(G) (2009) (post-May 2009 amendment).

108.   Because of the Defendants' conduct set forth in this Count, the United States has suffered actual damages in the hundreds of millions of dollars, with the exact amount to be determined at trial.

## COUNT TWO

(New Jersey False Claims Act, N.J. Stat. §§ 2A:32C-1 *et seq.*)

109.   Plaintiff re-alleges Paragraphs 1 through 102, inclusive.

110.   Based on the foregoing allegations, the Defendants are liable under the New Jersey False Claims Act, N.J. Stat. §§ 2A:32C-1 *et seq.*

## COUNT THREE

(Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63, §§ 5053 *et seq.*)

111.   Plaintiff re-alleges Paragraphs 1 through 102, inclusive.

112.   Based on the foregoing allegations, the Defendants are liable under the Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63, §§ 5053 *et seq.*

## COUNT FOUR

(Tennessee Medicaid False Claims Act, Tenn. Code §§ 71-5-181 *et seq.*)

113.   Plaintiff re-alleges Paragraphs 1 through 102, inclusive.

114.   Based on the foregoing allegations, the Defendants are liable under the Tennessee Medicaid False Claims Act, Tenn. Code §§ 71-5-181 *et seq.*

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff J. Douglas Strauser prays for the following relief:

1.      On Counts One through Four, judgment for the United States or the State, as applicable, against the Defendants in an amount equal to three times the damages the federal or state plaintiff government, respectively, has sustained because of the Defendants' actions, plus a civil penalty of $11,000 for each violation;

2.      On Counts One through Four, an award to the Relator of the maximum allowed under the federal or state law under which suit is brought by the Relator on behalf of the federal or state plaintiff, respectively;

3.      Against the Defendants, attorneys' fees, expenses and costs of suit; and

4.      Such other and further relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands that this matter be tried before a jury.

Respectfully submitted,

Timothy D. Eisel, OBA #15266
EISEL LAW
P.O. Box 2461
Edmond, Oklahoma 73083
Tel. No. 405-476-3666
Fax No. 405-359-5666


Shelley R. Slade
Admitted *pro hac vice*
Robert L. Vogel
Admitted *pro hac vice*
Janet L. Goldstein
Admitted *pro hac vice*
VOGEL, SLADE & GOLDSTEIN,
 LLP
1718 Connecticut Avenue, NW, 7th
Floor
Washington, D.C. 20009
Tel.:  202-537-5903
sslade@vsg-law.com

Attorneys for J. Douglas Strauser

Dated:  _MARCH 2_, 2015

## CERTIFICATE OF SERVICE

I, Timothy D. Eisel, hereby certify that on March 2, 2015, I caused a true

and correct copy of this First Amended Complaint to be served by certified U.S.

mail, return receipt requested and delivery restricted to the addressee, to:

The Honorable Eric Holder
Attorney General of the United States
950 Pennsylvania Avenue, NW
Washington, DC 20530

The Honorable E. Scott Pruitt
Attorney General of the State of Oklahoma
313 NE 21st Street
Oklahoma City, OK 73105

The Honorable Herbert H. Slatery III
Attorney General of the State of Tennessee
425 5th Avenue North #2
Nashville, TN 37243

The Honorable John Jay Hoffman
Acting Attorney General of the State of New Jersey
Richard J. Hughes Justice Complex
25 Market Street, P.O Box 080
Trenton, NJ 08625

I further certify that on this same day I delivered a true and correct copy of

this First Amended Complaint by hand to:

The Honorable Sanford C. Coats
United States Attorney for the Western District of Oklahoma
210 West Park Avenue, Suite 400
Oklahoma City, OK 73102

_____
Timothy D. Eisel, OBA #15266