**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. J. DOUGLAS STRAUSER; STATE OF NEW JERSEY ex rel. J. DOUGLAS STRAUSER; STATE OF OKLAHOMA ex rel. J. DOUGLAS STRAUSER; and STATE OF TENNESSEE ex rel. J. DOUGLAS STRAUSER, | |
| Plaintiffs, | |
| v. | Case No. 18-CV-673-GKF-FHM |
| STEPHEN L. LAFRANCE HOLDINGS, INC.; STEPHEN L. LAFRANCE PHARMACY, INC.; SUPER D DRUGS ACQUISITION CO.; DALECO, INC.; ARCADIA VALLEY DRUG CO.; MAY'S DRUG STORES, INC.; ELLISVILLE DRUG ACQUISITION CO.; JARCO PHARMACIES, INC.; JIM BAIN'S PHARMACY, INC.; S & W PHARMACY, INC.; CONSOLIDATED STORES, INC.; PHARM-MART PHARMACY OF WARREN, INC.; STEPHEN L. LAFRANCE, JR.; JASON LAFRANCE; and WALGREEN COMPANY, INC., | |
| Defendants. | |

## OPINION AND ORDER

This is a *qui tam* action alleging violations of the False Claims Act ("FCA"), 31 U.S.C.

§§ 3728–33, involving a scheme in which a pharmacy chain defrauded government health

programs by reporting inflated "usual and customary" prices for prescription drugs. Before the

court are two motions: the Motion to Dismiss [Doc. 87] filed by defendants Walgreen Co.

("Walgreens"), Stephen L. LaFrance Holdings, Inc. ("LaFrance Holdings"), and Stephen L.

LaFrance Pharmacy, Inc. ("LaFrance Pharmacy")[1] and the Motion to Dismiss [Doc. 88] filed by defendants Arcadia Valley Drug Co., Daleco, Inc., Ellisville Drug Acquisition Co., Jarco Pharmacies, Inc., Stephen L. LaFrance, Jr., and Jason LaFrance. Both motions seek dismissal pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6). The court addresses the motions together because each expressly incorporates the arguments of the other. For the reasons set forth below, both motions are denied.

## I. Procedural Background

Relator J. Douglas Strauser filed his *qui tam* complaint in the United States District Court for the Western District of Oklahoma on May 14, 2013. [Doc. 1]. The case was sealed while the government investigated the allegations. During that time, relator filed his First Amended Complaint ("FAC"). [Doc. 21]. On April 30, 2018, the United States file a Notice of Election to Decline Intervention. [Doc. 45]. Thereafter, the court in the Western District unsealed the case. [Doc. 48].

On July 16, 2018, defendants filed the instant two motions to dismiss. [Doc. 87; Doc. 88]. Relator filed a consolidated response in opposition to the two motions [Doc. 97], and each set of movants filed a reply [Doc. 100; Doc. 101]. On December 21, 2018, the court in the Western District transferred the case to this district pursuant to 28 U.S.C. § 1404(a). [Doc. 107].

## II. Allegations in the First Amended Complaint

In 114 paragraphs spanning sixty-six pages, the FAC asserts four counts against fifteen defendants—thirteen corporations and two individuals. The following is a non-exhaustive summary of the allegations in the FAC.

---

[1] The motion states it "is also filed on behalf of Defendants Super D Drugs Acquisition Co., May's Drug Stores, Inc., Jim Bain's Pharmacy, Inc., S&W Pharmacy, Inc., Consolidated Stores, Inc., and Pharm-Mart Pharmacy of Warren, Inc.," which "were all acquired by Walgreen Co., and, as a result, no longer exist as separate legal entities." [Doc. 87, p. 8 n.1].

## A. Relator's Background

Relator is a licensed pharmacist who owned and operated pharmacies in Missouri from 1976 to 2008. [FAC ¶ 9]. On June 30, 2008, he sold his pharmacy business to an entity under common ownership and control with LaFrance Pharmacy. Relator worked as a pharmacist at one of the pharmacies he sold until June 2013. [*Id.*].

## B. Defendants

LaFrance Holdings was founded by Stephen L. LaFrance, Sr. [FAC ¶ 20]. Between 2008 and the fall of 2012, LaFrance Holdings, along with LaFrance Pharmacy and Stephen L. LaFrance, Jr. and Jason LaFrance, owned and controlled a group of affiliated corporate entities ("the LaFrance affiliates") that, in turn, collectively owned a chain of pharmacies that were operated and controlled as a single enterprise. [FAC ¶ 21]. The LaFrance affiliates shared the brands USA Drug, Select Brand, Super D Drug, May's Drug, Med-X, and Drug Warehouse, and many of their pharmacies were known as USA Drug pharmacies, often with reference to one of the additional brands as well. [FAC ¶ 23].

By September 17, 2012, LaFrance Pharmacy had consolidated under its ownership most if not all of the LaFrance affiliates, which at the time collectively owned approximately 144 pharmacies in Arkansas, Mississippi, Missouri, New Jersey, Oklahoma, and Tennessee. [FAC ¶ 24]. On September 17, 2012, Walgreens purchased the stock of LaFrance Holdings for $438 million. Walgreens also purchased the assets or stock of certain affiliated entities. [*Id.*]. Walgreens thereby become the owner of LaFrance Pharmacy and acquired the USA Drug pharmacy business. [*Id.*].

## C.  Regulatory Background

### 1.  Usual and Customary ("U&C") Charge Requirements

During the relevant period (2008 through May 2013), the federal government required each state to comply with a number of specific requirements as a condition of the state's obtaining federal reimbursement for a portion of the state's Medicaid expenditures.  [FAC ¶ 43].  One of these federal requirements related to the appropriate reimbursement for pharmaceutical drugs. [*Id.*].  The federal government would not reimburse a state for its Medicaid expenditures for prescription drugs unless the state complied with certain payment limits.  [*Id.*].  To get federal reimbursement, the state was required to pay no more than the lowest of three separate rates, one of which was the dispending pharmacy's "usual and customary charge to the general public" for the drug.  [*Id.* (citing 42 C.F.R. § 447.512(b))].

To comply with federal regulations, state Medicaid programs enacted rules that required pharmacies to bill Medicaid no more than their "usual and customary charge to the general public" for prescription drugs.  [FAC ¶ 44].  The states required providers, including pharmacies, that billed Medicaid to certify that they were in compliance with Medicaid program rules and instructions.  [*Id.*].  The term "Usual and Customary charge" was understood throughout the pharmacy industry to refer to the amount a pharmacy charges cash-paying customers.  [FAC ¶ 45].

During the relevant period, federal law also mandated that pharmacies submitting claims electronically to Medicaid use a standard claim format for electronic transactions published by the National Council for Prescription Drug Programs ("NCPDP"), a pharmaceutical industry group that promoted standardization in the pharmaceutical industry.  [FAC ¶ 46 (citing 45 C.F.R. § 162.1102(a)–(c))].  The NCPDP's standard format included a field for "usual and customary charge," which the format's instructions defined to mean the "[a]mount charged cash paying customers for the prescription exclusive of sales tax or other amounts claimed."  [FAC ¶ 47].  The

seven states in which USA Drug operated stores—Arkansas, Kansas, Mississippi, Missouri, New Jersey, Oklahoma, and Tennessee—required pharmacies billing the state Medicaid program to complete the "usual and customary" field in the standard NCPDP format.  [FAC ¶ 48].

## 2. Medicare Part D Prescription Drug Benefit

To deliver Medicare Part D benefits to Medicare enrollees, the Centers for Medicare & Medicaid Services ("CMS") contracted with private insurance companies known as Part D Plan Sponsors ("Part D Sponsors"), which in turn offered enrollees a choice of prescription drug benefit plans.  [FAC ¶ 63].  To receive payment from CMS, Part D Sponsors were required to agree to give Part D enrollees access to "negotiated prices" for covered drugs—that is, the prices that the Part D Sponsors negotiated with providing pharmacies.  [FAC ¶ 64].

To fund the Part D prescription drug benefit, CMS paid a Part D Sponsor a per-enrollee subsidy based on a bid submitted by the Part D Sponsor the previous year that reflected the Part D Sponsor's anticipated costs.  [FAC ¶ 65].  At the end of each year, CMS "reconciled" the Part D Sponsor's actual allowable costs against the monthly subsidy payments to determine whether it needed to make further risk sharing, low-income subsidy, or reinsurance payments; or, conversely, whether the Part D Sponsor owed money to CMS.  [FAC ¶ 66].  To calculate these additional payments, CMS needed information about every drug claim submitted to the Part D Sponsor by pharmacies, either directly or through a Pharmacy Benefit Manager ("PBM") or other intermediary.  [*Id.*].

To submit claims for drugs dispensed to Medicare enrollees under Medicare Part D, a pharmacy had to individually contract with a Part D Sponsor that provided Part D benefits, or an intermediary organization.  [FAC ¶ 68].  A pharmacy that entered one of these contracts was known as a "network pharmacy."  When negotiating these contracts, Part D Sponsors typically required the inclusion of U&C pricing clauses that prohibited network pharmacies from charging more for

a covered drug than they would charge a cash-paying customer with no insurance coverage. [FAC ¶ 69]. Network pharmacies that submitted claims to Part D Plan Sponsors were required to certify to the accuracy, completeness, and truthfulness of the claim data and acknowledge that they would be used to seek federal funds. [FAC ¶ 70]. Network pharmacies were also required to use the NCPDP format to submit their charges to Part D Sponsors. [FAC ¶ 71].

**D.  Walmart's Four-Dollar Generic Program**

In 2006, Wal-Mart Stores, Inc. ("Walmart") launched a program that provided customers with four-dollar pricing for a thirty-day supply of any one of more than 300 commonly prescribed generic medications. [FAC ¶ 75]. In subsequent years, Walmart expanded the program so that it offered customers ten-dollar pricing for a ninety-day supply of many generic medications. [*Id.*]. Walmart made these same low prices available to Medicaid, charging Medicaid beneficiaries as well as cash-paying customers four dollars for a thirty-day supply and ten dollars for a ninety-day supply of the medications that were part of its program. [*Id.*].

**E.  The Alleged Scheme**

To compete with Walmart, Steven L. LaFrance, Jr., Jason LaFrance, and the LaFrance affiliates that they controlled began requiring the USA Drug pharmacies to match the pricing of the Walmart program, but only for cash-paying customers. [FAC ¶ 75]. By the fall of 2008, USA Drug's management began requiring all of the USA Drug pharmacies to offer the four-dollar generic pricing to any cash-paying customer who requested it. [FAC ¶ 77]. Once a customer had requested this pricing for a particular prescription, the pharmacy staff generally made a note in the patient's file to ensure the customer received the four-dollar generic pricing on all eligible generic drug prescriptions from that point forward. [*Id.*].

USA Drug marketed its four-dollar generic pricing by notifying physicians' offices that its pharmacies offered this pricing and through word of mouth. [FAC ¶ 78]. By the 2009–2010 fiscal

year, a majority of USA Drug's transactions with non-insured patients were made at four-dollar generic pricing for almost all medications on the Walmart list. [FAC ¶ 79]. For many of these drugs, more than ninety percent of USA Drug's transactions with non-insured customers were made at four-dollar generic pricing. [*Id.*].

Between the fall of 2008 and the September 2012 purchase by Walgreens, USA Drug management supplied the pharmacies with a billing software program. [FAC ¶ 81]. USA Drug's corporate headquarters inputted parameters into this program that established a single price for every drug that management characterized as the "Usual & Customary price." [*Id.*]. USA Drug's corporate headquarters instructed the pharmacies that they should override this pricing with four-dollar generic pricing for all cash-paying customers requesting it. [*Id.*]. To facilitate the ability of its pharmacists to override retail pricing with four-dollar generic pricing for cash-paying customers, USA Drug's computer systems were regularly updated with Walmart's current list of generic medications with four-dollar generic pricing. [FAC ¶ 82]. Whenever pharmacy staff accessed the computer screens that came up during the billing process, the billing software would inform the pharmacist or technician if the generic drug was on the Walmart four-dollar generic pricing list. Some pharmacies kept a paper copy of the Walmart list handy so they could readily determine whether any given generic drug was on the list. [*Id.*].

When he was a pharmacist employed by USA Drug, relator repeatedly expressed to management his concern that USA Drug's failure to offer the four-dollar generic pricing to Medicaid would expose the company to potential liability if the company's pharmacies were to be audited. [FAC ¶ 83–84].

After Walgreens acquired ownership and control of LaFrance Pharmacy in September 2012, Walgreens, with actual knowledge of the USA Drug four-dollar generic pricing program,

allowed the USA Drug pharmacies for a period of time to continue to utilize four-dollar generic pricing for cash-paying customers without making this pricing available to Medicare Part D and Medicaid. [FAC ¶ 86]. Walgreens' management directed the USA Drug stores that they would have to discontinue the four-dollar generic pricing for cash customers when the pharmacies' computer systems were converted to new systems used by Walgreens' stores. [*Id.*].

In Count I, the FAC asserts a claim for violations of the federal False Claims Act, 31 U.S.C. § 3729(a). [FAC ¶¶ 103–08]. In Counts II, III, and IV, the FAC asserts claims for violations of the false claim statutes of New Jersey, Oklahoma, and Tennessee, respectively. [FAC ¶¶ 109–14].

### III. Standard for Motions to Dismiss

#### A. Federal Rule of Civil Procedure 12(b)(6)

In considering a motion to dismiss under FED. R. CIV. P. 12(b)(6), a court must determine whether the plaintiff has stated a claim upon which relief can be granted. A complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The plausibility requirement "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" of the conduct necessary to make out the claim. *Id.* at 556. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court "must determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed." *Lane v. Simon*, 495 F.3d 1182, 1186 (10th Cir. 2007) (quoting *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007)).

## B. Federal Rule of Civil Procedure 9(b)

Pursuant to FED. R. CIV. P. 9(b), "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." However, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id.* "Rule 9(b)'s purpose is 'to afford [a] defendant fair notice' of a plaintiff's claims and the factual grounds supporting those claims." *George v. Urban Settlement Servs.*, 833 F.3d 1242, 1255 (10th Cir. 2016) (quoting *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1252 (10th Cir. 1997)). Thus, at a minimum, the complaint must allege "the time, place, and contents of the false representation, the identity of the party making the false statements and the consequences thereof." *United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 727 (10th Cir. 2006) (quoting *Koch v. Koch Indus.*, 203 F.3d 1202, 1236 (10th Cir. 2000)).

## IV. Statutory Background

Although Congress has repeatedly amended the False Claims Act, "its focus remains on those who present or directly induce the submission of false or fraudulent claims." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1996 (2016). "The FCA covers all fraudulent attempts to cause the government to pay out sums of money." *United States ex rel. Polukoff v. St. Mark's Hosp.*, 895 F.3d 730, 734 (10th Cir. 2018) (internal quotation marks omitted).

The FCA's *qui tam* provisions allow a private person, called the relator, to sue on behalf of the government. 31 U.S.C. § 3730(b). The government may intervene and take over the relator's case, *id.* § 3730(b)(2) and (c)(3), but it often declines to do so. In such instances, the relator conducts the litigation and shares any recovery with the government. *Id.* § 3730(d).

In relevant part, 31 U.S.C. § 3729(a)(1) imposes civil liability on any person who:

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]

. . .

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government . . . .[2]

"Rule 9(b) supplements 8(a) in setting forth the pleading requirements under the FCA." *United States ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163, 1171 (10th Cir. 2010). Because the rule's purpose is to afford defendants fair notice, "claims under the FCA need only show the specifics of a fraudulent scheme and provide an adequate basis for a reasonable inference that false claims were submitted as part of that scheme." *Id.* at 1172. "Practically speaking, FCA claims comply with Rule 9(b) when they 'provid[e] factual allegations regarding the who, what, when, where and how of the alleged claims.'" *Polukoff*, 895 F.3d at 745 (quoting *Lemmon*, 614 F.3d at 1171).

## V. Discussion

Defendants challenge the sufficiency of the FAC on multiple grounds. The first motion to dismiss advances five main arguments:

The [FAC] fails to meet the requirements of Federal Rules 12(b)(6) and 9(b) because it (1) fails to plead the submission of any FCA or State FCA violation outside of one pharmacy in Missouri; therefore any alleged violation of the FCA in Count I outside of Missouri and the entirety of Counts Two, Three, and Four should be dismissed; (2) improperly clusters defendants together without adequately pleading claims against any particular defendant, requiring

---

[2]  The Fraud Enforcement and Recovery Act of 2009 ("FERA"), Pub. L. No. 111–21, § 4, 123 Stat. 1616 (2009), modified and renumbered the subsections of § 3729.  Because the amendments are not determinative of the resolution of the instant motions, this decision cites the post-FERA version.

dismissal of Walgreens, LaFrance Holdings and LaFrance Pharmacy; (3) insufficiently alleges facts supporting the elements of "scienter" under the FCA or State FCAs; (4) insufficiently alleges facts supporting "materiality" under the FCA or State FCAs; and (5) insufficiently alleges facts to establish liability directly or for the alleged conduct of the other Defendants by Walgreens.

[Doc. 87, pp. 13–14]. The second motion to dismiss advances two main arguments, contending that relator fails to plead (1) details concerning the roles of particular defendants and (2) the falsity of any claim or statement. [Doc. 89, pp. 12–30]. As noted above, each motion expressly incorporates by reference the arguments of the other. [Doc. 87, p. 9 n.2; Doc. 89, p. 7 n.1; Doc. 100, p. 1 n.1; Doc. 101, p. 5 n.1]. The court addresses defendants' various arguments below.

As a preliminary matter, the court notes that this is not the first *qui tam* suit alleging a scheme to defraud government health programs by reporting inflated U&C prices for prescription drugs. Several other courts have denied motions to dismiss in cases involving similar allegations. *See, e.g.*, *United States ex rel. Proctor v. Safeway, Inc.*, No. 11-3406, 2016 WL 7017231, at *15 (C.D. Ill. Dec. 1, 2016) (denying motion to dismiss); *United States ex rel. Schutte v. Supervalu, Inc.*, 218 F. Supp. 3d 767, 770 (C.D. Ill. 2016) (same); *United States ex rel. Doe v. Houchens Indus., Inc.*, No. 1:13-CV-00196-RLY, 2015 WL 133706, at *3 (S.D. Ind. Jan. 9, 2015) (same); *United States ex rel. Garbe v. Kmart Corp.* ("*Garbe I*"), 968 F. Supp. 2d 978, 981 (S.D. Ill. 2013) (same);[3] *but see United States ex rel. Rahimi v. Rite Aid Corp.*, No. 2:11-CV-11940, 2018 WL 1744796, at *2 (E.D. Mich. Apr. 11, 2018) (finding deficiencies under Rule 9(b) and granting relator leave to amend). Although these decisions come from outside this circuit, the court has considered them for their persuasive value.

---

[3]    *See also United States ex rel. Garbe v. Kmart Corp.* ("*Garbe II*"), 73 F. Supp. 3d 1002, 1019 (S.D. Ill. 2014) (granting in part and denying in part motion for partial summary judgment), *aff'd in part, rev'd in part and remanded*, *United States ex rel. Garbe v. Kmart Corp.* ("*Garbe III*"), 824 F.3d 632 (7th Cir. 2016).

## A. Falsity

Defendants contend relator's allegations are insufficient because he fails to plead the falsity of any claim or statement. The relevant provisions of the FCA require relator to identify a "false or fraudulent claim." *See* 31 U.S.C. §§ 3729(a)(1)(A) and (B). With certain exceptions not relevant here, Congress has defined the term "claim" for purposes of § 3729 as follows:

> [A]ny request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that—
>
> > (i) is presented to an officer, employee, or agent of the United States; or
> >
> > (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—
> >
> > > (I) provides or has provided any portion of the money or property requested or demanded; or
> > >
> > > (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded[.]

31 U.S.C. § 3729(b)(2)(A).

Although Congress has not defined what makes a claim "false" or "fraudulent," the Supreme Court has held that the term "fraudulent" in the statute "incorporates the common-law meaning of fraud." *Escobar*, 136 S. Ct. at 1999. "Because common-law fraud has long encompassed certain misrepresentations by omission, 'false or fraudulent claims' include more than just claims containing express falsehoods." *Id.* Furthermore, the phrase "false or fraudulent" includes "both factually false and legally false requests for payment." *Polukoff*, 895 F.3d at 741 (citing *Lemmon*, 614 F.3d at 1168). The Tenth Circuit has explained this distinction as follows:

> Factually false claims generally require a showing that the payee has submitted an incorrect description of goods or services provided or

> a request for reimbursement for goods or services never provided.
> Claims arising from legally false requests, on the other hand,
> generally require knowingly false certification of compliance with a
> regulation or contractual provision as a condition of payment.

*Polukoff*, 895 F.3d at 741 (internal quotation marks and citations omitted). Legal falsity can arise

from false certification that is either express or implied. *Id.*

The FAC alleges that the USA Drug pharmacies submitted false claims by misrepresenting

their U&C charges in order to increase their reimbursement. Defendants challenge the sufficiency

of relator's allegations of falsity both as to the relevant state Medicaid programs and as to Medicare

Part D.

### 1. Falsity as to State Medicaid Programs

Defendants argue that relator fails to allege how the exclusion of customer-requested price-

matching from U&C prices violated the U&C billing requirements under any state Medicaid

program. The court disagrees.

Federal Medicaid regulations limit pharmacy reimbursement to a provider's "usual and

customary charges to the general public." *Schutte*, 218 F. Supp. 3d at 773 (citing 42 C.F.R.

§ 447.512(b)); *see also* [FAC ¶ 43]. State Medicaid U&C regulations are based on this

requirement, and all state plans must periodically determine that there are in accordance with

§ 447.512. *Schutte*, 218 F. Supp. 3d at 773 (citing 42 C.F.R. § 447.518(B)(1)(ii)); *see also* [FAC

¶ 44]. Relator alleges that the Medicaid rules of each of the seven states at issue prohibit a

pharmacy from billing in excess of the provider's "usual and customary charge," which is

understood throughout the industry to refer to the amount a pharmacy charges cash-paying

customers. [FAC ¶¶ 45, 50–62]. Relator contends that USA Drug attempted to circumvent the

U&C charge rules by maintaining a phony list of supposed "U&C charges" in its computer system

while marketing its true charges quietly, in doctors' offices, by word of mouth, and directly to customers in its stores. [FAC ¶¶ 78, 81–82, 89–91].

Other courts have considered allegations of similar efforts to evade U&C charge requirements. In one FCA case, the Seventh Circuit affirmed a grant of partial summary judgment in favor of the relator, holding that the prices Kmart charged members of its generic drug discount program were Kmart's U&C charges. *Garbe III*, 824 F.3d at 643. Kmart's alleged scheme started as a price-matching program (like the scheme alleged here) and then underwent several iterations. *Id.* at 636. Kmart eventually offered discount generics, but only if a customer would pay a nominal fee and "join" the program. *Id.* at 643–45.

The *Garbe III* court observed that, "[u]nless state regulations provide otherwise, the 'usual and customary' price is defined as the 'cash price offered to the general public.'" *Id.* at 643. The court then rejected Kmart's argument that the phrase "general public" excludes customers who join a discount program, reasoning as follows:

> Allowing Kmart to insulate high "usual and customary" prices by artificially dividing its customer base would undermine a central purpose of the statutory and regulatory structure. The "usual and customary" price requirement should not be frustrated by so flimsy a device as Kmart's "discount programs." Because Kmart offered the terms of its "discount programs" to the general public and made them the lowest prices for which its drugs were widely and consistently available, the Kmart "discount" prices at issue represented the "usual and customary" charges for the drugs.

*Id.* at 643–45; *see also Garbe I*, 968 F. Supp. 2d at 983–84 (denying Kmart's motion to dismiss). In a similar case, a court in the Southern District of Indiana reached the same result, rejecting a pharmacy chain's argument that "the special pricing it offers the members of its Rewards Program is not the U & C price because that price is offered only to those who enroll in the program." *Doe*, 2015 WL 133706, at *3.

In *Schutte*, a court in the Central District of Illinois denied a motion to dismiss filed by a pharmacy chain accused of perpetrating a "price-match" scheme similar to the one alleged in this case. 218 F. Supp. 3d at 772. The Supervalu chain offered a program to match certain competitors' prices for generic drugs. *Id.* at 770. The court rejected Supervalu's argument that no law required it to report price matches as the U&C price and concluded that the relators had provided fair notice of falsity under the FCA. *Id.* at 772–73.

Here, relator alleges that the pharmacies offered four-dollar generic pricing to any cash-paying customer who requested it, and that, as a practical matter, the pharmacies generated the four-dollar generic pricing for a cash-paying customer even without the customer's request. [FAC ¶ 77]. He further alleges that, during certain periods, a *majority* of the pharmacies' transactions with non-insured patients were made at four-dollar generic pricing for almost all medications on the Walmart list, and that, for many of these drugs, *more than ninety percent* of transactions with non-insured customers were made at four-dollar generic pricing. [FAC ¶ 79]. Through these allegations and the other allegations in the FAC, relator plausibly alleges that, for some drugs, the four-dollar generic pricing was the pharmacies' "usual and customary charge to the general public" under any reasonable interpretation of that phrase.[4] Therefore, relator plausibly alleges that some U&C charges reported by the pharmacies were false because they were higher than the four-dollar generic pricing.

The FAC alleges that USA Drug operated in seven states: Arkansas, Mississippi, Missouri, New Jersey, Oklahoma, and Tennessee. Defendants do not argue that Missouri, Kansas,

---

[4] Defendants criticize the U&C definitions offered by relator as "varied and inconsistent." [Doc. 101, p. 12 n.12]. But the court must draw reasonable inferences in relator's favor at the motion-to-dismiss stage. Relator need not present a definitive, unassailable definition of "usual and customary charges." It is sufficient that relator has plausibly alleged that U&C prices reported by defendants were inconsistent with any reasonable interpretation of the phrase.

Tennessee, and Mississippi materially altered the general definition of a U&C charge. [Doc. 89, pp. 28–29]. They do argue, however, that the exclusion of price-match discounts from U&C prices did not violate the specific rules of the Medicaid programs in three states—Arkansas, Oklahoma, and New Jersey.[5] These arguments are addressed below.[6]

### i. Arkansas Medicaid Program

Title 16, Division 6, Rule 22 of the Arkansas Administrative Code, also known as the Code of Arkansas Rules and Regulations, contains a "Pharmacy Provider Manual." Both relator and defendants point to Section 251.100 of the Pharmacy Provider Manual. Ark. Admin. Code 016.06.22-251.100. Section 251.100 defines the "usual and customary charge" as "the price that is charged for 90% of the prescriptions for private pay customers for the same product and quantity." *Id.* It further provides, "If the prices on more than 10% of the prescriptions for a given drug and/or quantity are found to vary in a given time frame, auditors will select the most prevalent price as the usual and customary charge." *Id.*

Defendants argue that relator fails to plead facts indicating that "for a given drug, a given quantity, a given time period, and a given pharmacy in Arkansas, a lower price-matched price was being charged for 90% or more of the prescriptions for private pay customers." [Doc. 26, p. 89]. Defendants appear to overstate relator's burden. Contrary to defendants' suggestion, the definition

---

[5] The court notes that, at least for purposes of relator's federal FCA claim, arguments based on subtle variations in U&C billing regulations across state Medicaid programs are better suited to resolution at a later stage—when more facts are available and the parties have briefed the issues in greater depth. *Cf. United States ex rel. Booker v. Pfizer, Inc.*, 9 F. Supp. 3d 34, 52 (D. Mass. 2014) ("For purposes of federal fraud, the treatment of specific claims in states with more flexible reimbursement schemes can be reserved for later stages of the litigation, and is more appropriately viewed as a question of damages.").

[6] Notably, in *Garbe II*, the district court considered similar arguments. 73 F. Supp. 3d at 1018–20, *rev'd in part on other grounds*, *Garbe III*, 824 F.3d 632. Kmart argued that it was entitled to summary judgment with respect to claims submitted to Medicaid programs in Minnesota, Nevada, and Alabama because those states excluded discount prices given to certain segments of a pharmacy's customers from their U&C definitions. *Id.* at 1018. After closely examining the relevant state statutes and regulations—which contained language somewhat similar to the regulations at issue here—the court rejected Kmart's arguments. *Id.* at 1019–20.

provided in Section 251.100 does not require relator to show that "a lower price-matched price was being charged for 90% or more of the prescriptions." It only requires relator to show that a reported U&C price was neither "the price that [was] charged for 90% of the prescriptions for private pay customers for the same product and quantity" nor "the most prevalent price."

Regardless, the FAC alleges that, by its 2009–2010 fiscal year, USA Drug gave four-dollar pricing to *more than ninety percent* of the cash transactions for many of the drugs on the Walmart list. [FAC ¶ 79]. As discussed *infra*, section V(D), relator need not allege specific examples of false claims for each state and each government program that defendants allegedly defrauded. Accepting the factual allegations in the FAC as true, and drawing reasonable inferences therefrom, the court finds and concludes that relator adequately alleges falsity as to claims submitted to the Arkansas Medicaid program.

Defendants also highlight another portion of Section 251.100, which provides as follows:

> All special prices, including but not limited to prices given to family members or other select customers, must be indicated (e.g., "special" or "SP") on all prescriptions. If special prices are not clearly identifiable on private-pay prescriptions, auditors will use these prices to determine the pharmacy's usual and customary charge.

Ark. Admin. Code 016.06.22-251.100. Defendants argue that relator "fails to address whether any price-matched prescriptions in Arkansas were marked as 'special prices' for purposes of determining U&C price." [Doc. 89, p. 26].

The court finds defendants' argument unpersuasive. Rules 9(b) and 12(b)(6) do not require pleadings to explicitly address and foreclose every possible defense. Moreover, the allegations in the FAC support a reasonable inference that the pharmacies' four-dollar generic prices were not "special prices" within the meaning of Section 251.100, which describes "special prices" as "including but not limited to prices given to family members or other select customers." Ark.

Admin. Code 016.06.22-251.100.  Defendants assert that "Arkansas Medicaid does not limit what constitutes a 'special price'. . . ."  [Doc. 101, p. 13 n.13].  However, the surrounding context and the plain meaning of the word "special" suggest that the phrase "special prices" has a limited meaning.  The central purpose of the U&C regulations would be easily frustrated if pharmacies could exclude *any* price from their U&C calculations simply by labeling it as a "special price"— even when the price was available upon request to all cash-paying customers and was charged to over ninety percent of cash-paying customers.  *Cf. Garbe II*, 824 F.3d at 645 ("The 'usual and customary' price requirement should not be frustrated by so flimsy a device as Kmart's 'discount programs.'").

### ii.  Oklahoma Medicaid Program

With respect to the Oklahoma Medicaid Program ("SoonerCare"), both relator and defendants point to section 317:30-5-78 of the Oklahoma Administrative Code.  That section provides, in relevant part, that a "pharmacy is responsible to determine its usual and customary charge to the general public and submit it to OHCA on each pharmacy claim."  Okla. Admin. Code 317:30-5-78(d)(2).  It further provides as follows:

> The OHCA defines general public as the patient group accounting for the largest number of non-SoonerCare prescriptions from the individual pharmacy, but does not include patients who purchase or receive their prescriptions through other third-party payers. If a pharmacy offers discount prices to a portion of its customers (i.e. - 10% discount to senior citizens), these lower prices would be excluded from the usual and customary calculations unless the patients receiving the favorable prices represent more than 50% of the pharmacy's prescription volume.

*Id.*

Defendants argue that relator fails to plead facts indicating that, "for a given drug, a given quantity, a given time period, and a given pharmacy in Oklahoma, a price-matched price represented 'more than 50% of the pharmacy's prescription volume.'"  [Doc. 89, p. 27].  In their

reply brief, defendants further argue that "more than 50% of the pharmacy's prescription volume" means more than fifty percent of the pharmacy's *total* prescription volume, not limited to "private pay" or "cash" customers. [Doc. 101, pp. 13–14].

Defendants' argument has two flaws. First, the exclusion on which defendants rely applies only if "a pharmacy offers discount prices to a *portion* of its customers," such as a "10% discount to senior citizens." Okla. Admin. Code 317:30-5-78(d)(2) (emphasis added). But defendants allegedly offered four-dollar generic pricing to *any* cash-paying customer who requested it. [FAC ¶ 77]. Such practices lack the selectivity contemplated by the exclusion, as illustrated by the example of a discount for senior citizens. *Cf. Garbe II*, 73 F. Supp. 3d at 1019 ("Kmart discounts prices—through its generic drug programs—to *any* person, so long as they fill out a form to participate. This is far different from the example set forth in Nevada's definition that illustrates what it means to discount a price to a specified customer, such as senior citizens.").

Second, defendants do not explain why the court should read the word "total" into the phrase "the pharmacy's prescription volume," and such an interpretation appears to yield counterintuitive results. For example, under defendants' interpretation, a pharmacy that sold fifty-one percent SoonerCare prescriptions and forty-nine percent cash prescriptions could charge ninety-nine percent of cash customers a "discount price" and report the price paid by only one percent of cash customers as the "usual and customary charge to the general public" because the customers receiving the discount price would represent less than fifty percent of the pharmacy's *total* prescription volume. When read in context, the phrase "the pharmacy's prescription volume" could refer, more sensibly, to the pharmacy's volume of prescriptions sold *to the general public*. Notably, the phrase appears in the section entitled "usual and customary charge to the general public" and immediately follows the definition of "general public." *See* Okla. Admin. Code

317:30-5-78(d)(2).  The regulation indirectly references cash-paying customers when it defines "general public" to exclude patients who receive their prescriptions through SoonerCare or "other third-party payers."  *Cf. Garbe II*, 73 F. Supp. 3d at 1019 ("[T]he statute references cash-paying customers when it specifically excludes transactions with third-party payers.").  Accepting the factual allegations in the FAC as true, and drawing reasonable inferences therefrom, the court finds and concludes that relator adequately alleges falsity as to claims submitted to SoonerCare.

### iii.  New Jersey Medicaid Program

With respect to the New Jersey Medicaid Program, both relator and defendants point to section 10:51-1.10 of the New Jersey Administrative Code.  That section defines "usual and customary charge" as follows:

> The usual and customary charge to the Medicaid or NJ FamilyCare program is defined as the amount a provider charges the general public for a prescription for the same drug product (same NDC number) in the same quantity as the prescription being dispensed to a Medicaid or NJ FamilyCare beneficiary. "Usual and customary charge" means the actual charge made to the majority (51 percent) of the total patient population served by the individual pharmacy.
>
> 1. The provider shall not charge the programs more than would be charged to a cash customer when the general public, including private third party plans, accounts for more than 50 percent of a provider's total prescription volume.
>
> i. In the event Medicaid, NJ FamilyCare and/or PAAD represent more than 50 percent of a provider's total prescription volume, then, for reimbursement purposes, the provider's usual and customary charge may be considered the amount the programs would reimburse for the same services.

N.J. Admin. Code § 10:51-1.10(b).

Defendants argue that relator fails to plead "any facts regarding a New Jersey pharmacy's prescription volume—which is necessary in determining the U&C price for a given drug and quantity."  [Doc. 89, p. 28].  If, during the relevant period, every USA Drug pharmacy in New

Jersey relied primarily on state-funded programs, then subsection 10:51-1.10(b)(1)(i) might preclude relator's claims as to the New Jersey Medicaid program. Defendants do not affirmatively assert that subsection actually applies here, but they do correctly observe that the allegations in the FAC leave open that possibility.

That does not mean, however, that relator has failed to state a claim. Rule 9(b) "does not require omniscience." *Polukoff*, 895 F.3d at 745. Instead, it requires that "the circumstances of the fraud be pled with enough specificity to put defendants on notice as to the nature of the claim." *Id.* Accordingly, "in determining whether a plaintiff has satisfied Rule 9(b), courts may consider whether any pleading deficiencies resulted from the plaintiff's inability to obtain information in the defendant's exclusive control." *Id.* (quoting *George*, 833 F.3d at 1255). Presumably, defendants control information relating to the prescription volumes of their pharmacies in New Jersey. Under these circumstances, relator has adequately alleged falsity as to claims submitted to the New Jersey Medicaid program. *See Polukoff*, 895 F.3d at 745 (excusing deficiencies resulting from the relator's inability to obtain information within the defendants' control).

### 2. Falsity as to Medicare Part D

Relator alleges that the USA Drug pharmacies misrepresented their U&C charges when billing Medicare Part D for generic drugs on the Walmart list. [FAC ¶ 91]. According to the FAC, relator "recalls consistently seeing provisions in contracts between USA Drug and PBMs . . . that required USA Drug stores to charge no more than their 'usual and customary charge' when billing Medicare Part D." [FAC ¶ 91].

Defendants argue that relator's allegations are insufficient because relator fails to identify "any specific contractual language" requiring defendants to report price matches as the U&C price. [Doc. 89, p. 22]. The court disagrees. Relator alleges the existence of contracts and the substance of the relevant provisions. He further alleges that the term "usual and customary charge" is

understood throughout the pharmacy industry to refer to the amount a pharmacy charges cash-paying customers. [FAC ¶ 45]. Relator contends the pharmacies' prescription drug claims were false because they did not comply with the Part D contract requirements. [Doc. 97, p. 29 n.10].

Defendants have not identified any legal requirement that a pleading directly quote contractual language; nor have they explained why direct quotation is necessary here to provide fair notice of relator's claims. Defendants have not denied that such contracts exist, nor have they submitted copies of the contracts to refute relator's allegations regarding the relevant U&C provisions. Accepting the factual allegations in the FAC as true, and drawing reasonable inferences therefrom, the court finds and concludes that relator adequately alleges falsity as to Medicare Part D claims. *Cf. Schutte*, 218 F. Supp. 3d at 773 (allegations that Supervalu perpetrated similar price-match scheme against Medicare Part D provided fair notice of falsity).

## B. Scienter

Defendants contend relator fails to plead scienter with sufficient particularity. The relevant provisions of the FCA apply to persons who act "knowingly." *See* 31 U.S.C. § 3729(a)(1)(A), (B), and (G). For purposes of section 3729, Congress has defined "knowingly" to mean that a person (i) has actual knowledge of information; (ii) acts in deliberate ignorance of the truth or falsity of information; or (iii) acts in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b)(1)(A). Furthermore, "knowingly" requires no proof of specific intent to defraud. 31 U.S.C. § 3729(b)(1)(B). Federal Rule of Civil Procedure 9(b) provides, in relevant part, that knowledge "may be alleged generally."

The FAC contains numerous allegations pertaining to defendants' knowledge. For example, relator alleges that "the Defendants *knowingly* have submitted and/or caused the submissions of false claims that have caused the federal-state Medicaid program, in each state in which the USA Drug pharmacies do business, as well as Medicare Part D and other Government

Health Plans, to pay excessive amounts for many of the generic medications listed on the brochure . . . ."  [FAC ¶ 101] (emphasis added).  Additionally, "the Defendants have *knowingly* and improperly avoided an obligation to repay funds owed the United States and the state Plaintiffs, by improperly failing to disclose and return overpayments."  [FAC ¶ 102] (emphasis added); *see also* [FAC ¶¶ 86, 105–07].  Relator also alleges that he repeatedly warned defendants, including Walgreens, USA Drug management, and the two individual defendants, that failure to offer four-dollar generic pricing to Medicaid and third-party insurers exposed the company to liability.  [FAC ¶¶ 84–87, 96–100].  Specifically, upon learning of USA Drug's implementation of four-dollar generic pricing for cash-paying customers but not for Medicaid, relator expressed his objections in communications with Stephen LaFrance, Jr., Jason LaFrance, Joe Courtright, and Kelly Barnes.  [FAC ¶ 98].  In or about March or April 2009, Mr. Courtright, then-CEO of USA Drug, defended USA Drug's practices by informing relator that the Medicaid programs in the states in which USA Drug did business had not been auditing compliance with U&C rules.  [FAC ¶ 99].  Thus, relator plausibly alleges that defendants acted with actual knowledge, deliberate ignorance, or, at least, reckless disregard of the pharmacies' false reporting of U&C charges.  *Cf. Schutte*, 218 F. Supp. 3d at 774 (allegations against Supervalu of similar price-match scheme satisfied "knowledge" requirement).

Defendants advance two main arguments regarding scienter, which the court addresses below.

### 1.  "Ambiguous" Definitions of U&C Charges

Defendants argue that they "could not have formed the requisite scienter to violate the FCA or State FCAs because excluding customer-requested discount pricing of generic drugs from the U&C charges was a reasonable interpretation of [an] ambiguous legal framework and not clearly proscribed by law."  [Doc. 87, p. 22].  Defendants contend that relator fails to cite "a single statute,

regulation, or guidance document that *expressly required* any Defendant to report non-advertised discount pricing, such as price matching, as the U&C charges." [Doc. 87, p. 24]. They further contend that a "reasonable reading of the 'charge to the general public' is the pharmacy's own retail price charged to cash customers, not a competitor's price honored upon customer request." [*Id.*].

The court finds defendants' argument unpersuasive for two reasons. First, defendants do not identify the source of any requirement that prices must be "advertised" to be considered U&C charges. And, even if such a requirement existed, relator alleges that USA Drug marketed its four-dollar generic pricing by notifying physicians' offices and through word of mouth. [FAC ¶ 78]. Relator alleges that, *pursuant to instructions from corporate headquarters*, the pharmacies did not advertise the four-dollar generic pricing in the media or through brochures, signs, or other promotional materials; however, this fact could reflect defendants' efforts to avoid detection of the scheme and thus could *support* a finding of scienter. [FAC ¶ 89].

Second, defendants' argument is in tension with the plain meaning of the words "usual and customary," as well as relator's allegation that the phrase is understood throughout the pharmacy industry to refer to the amount a pharmacy *charges* cash-paying customers. [FAC ¶ 45]. Relator plausibly alleges that, where a price for a given drug was available to *any* cash-paying customer who requested it and *over ninety percent* of cash transactions were charged at that price, no reasonable interpretation of the U&C requirements would allow defendants to report a U&C charge higher than that price.

### 2. Scienter as to Corporate Defendants

Some of the corporate defendants argue that relator's scienter allegations are insufficient because he fails "to identify the individuals who formulated the alleged plan and knowingly submitted a false claim or false certifications or retained alleged overpayments." [Doc. 87, p. 26].

"[U]nder Rule 9(b), it suffices that *any* employee, acting within the scope of his or her employment, had knowledge." *Polukoff*, 895 F.3d at 745 n.9; *see also United States ex rel. Heath v. AT&T, Inc.*, 791 F.3d 112, 125 (D.C. Cir. 2015) ("The complaint makes clear . . . that corporate levers were pulled; identifying precisely who pulled them is not an inexorable requirement of Rule 9(b) in all cases."); *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 506 (6th Cir. 2007) ("Where, as here, the relator has alleged that the corporation has committed the fraudulent acts, it is the identity of the corporation, not the identity of the natural person, that the relator must necessarily plead with particularity.").

Relator alleges the corporate defendants programmed software and instructed pharmacy staff to bill one price to cash-paying customers and another to the government. [FAC ¶ 81]. He names multiple USA Drug managers and executives who discussed their knowledge of the billing practices with him. [FAC ¶¶ 75, 96–97]. He also alleges he specifically warned the individual defendants, as well as USA Drug's CEO and a Walgreens manager that these practices violated the law. [FAC ¶¶ 83–86, 98–100]. Relator thus alleges scienter adequately as to the corporate defendants.

## C. Materiality

Defendants argue that relator fails to allege materiality. The FCA defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. 3729(b)(4). For purposes of determining whether a misrepresentation is actionable under the FCA, materiality looks "to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Escobar*, 136 S. Ct. at 2002 (quoting 26 R. Lord, Williston on Contracts § 69:12, p. 549 (4th ed. 2003)).

In *Escobar*, the Supreme Court described the materiality standard as "demanding" and noted the possibility that materiality could be decided on a motion to dismiss. *See* 136 S. Ct. at

2003, 2004 n.6. But the *Escobar* court "did not suggest that the issue should be routinely decided at such a stage." *United States ex rel. Brooks v. Stevens-Henager Coll.*, 305 F. Supp. 3d 1279, 1301 (D. Utah 2018) (explaining that materiality "is usually a determination that is left to the jury"); *see also United States v. Gaudin*, 515 U.S. 506, 512 (1995) (materiality inquiry is peculiarly one for the trier of fact).

Courts have found the materiality requirement satisfied in *qui tam* cases involving similar U&C fraud allegations. *See, e.g.*, *Rahimi*, 2018 WL 1744796, at *7 (relator adequately alleged materiality because "the U&C price is a factor in determining how much CMS will reimburse pharmacies"); *Schutte*, 218 F. Supp. 3d at 773–74 (materiality satisfied where relators alleged that reporting an inflated U&C price results in overpayment by the government health program); *Garbe I*, 968 F. Supp. 2d at 987 (relator adequately alleged materiality, as "it is obvious here that reporting false amounts would have a natural tendency to influence the Government's actions, by inflating the amount of its payment"); *Garbe III*, 824 F.3d at 639 ("[T]o the extent Kmart made false claims [regarding inflated U&C charges], they were material: those claims were the basis of the federal monies Kmart received.").

As explained by the Seventh Circuit, the "materiality rule requires only that the false record or statement influence the 'payment *or receipt* of money or property.'" *Garbe III*, 824 F.3d at 639 (quoting 31 U.S.C. § 3729(b)(4)). Thus, relator is required to show only that the allegedly false claims were material to the pharmacies' receipt of more money than they should have received. *See id.* Here, relator alleges that the government overpaid because the pharmacies charged government payers more than they agreed to charge. The alleged misrepresentations go to an essential element of the bargain—price. By alleging the structure of the Medicare Part D and Medicaid programs, the reason government payers require U&C pricing or access to PBM's

negotiated rates, the pharmacies' scheme to hide their true U&C charges, and the impact of the overcharges, the FAC adequately pleads materiality.

## D. Alleged Violations Outside of Missouri

In paragraphs ninety-four and ninety-five of the FAC, relator alleges over one hundred specific "examples of instances in which a USA Drug pharmacy submitted false claims to Medicaid or Medicare Part D" as part of the defendants' alleged scheme. All of the alleged examples involve sales by a pharmacy called Strauser Drugs in Sullivan, Missouri, during the month of January 2012. [FAC ¶¶ 94–95]. Defendants argue the court should dismiss Counts II, III, IV in their entirety, as well as Count I as to any claims submitted to a federal healthcare program outside of Missouri, because relator fails to allege any claims with particularity as to any state or federal program outside of Missouri. [Doc. 87, pp. 17–18].

The Tenth Circuit has explained that claims under the FCA "need only show the specifics of a fraudulent scheme and provide an adequate basis for a reasonable inference that false claims were submitted as part of that scheme." *Polukoff*, 895 F.3d at 745 (quoting *Lemmon*, 614 F.3d at 1172). In FCA cases, courts have allowed relators alleging a broad scheme to plead examples of specific instances of fraud in order to satisfy the particularity requirements of Rule 9(b). *See, e.g.*, *Northstar Alarm Servs., LLC v. Alder Home Prot.*, No. 2:17-CV-1097-DN-PMW, 2018 WL 3611069, at *1 (D. Utah July 27, 2018) ("With allegations of a broad scheme of fraud, Rule 9(b) is satisfied when (1) the plaintiff can plead at least a single instance of a distinct false claim with particularity that is representative of the scheme described, and (2) provides details about how the scheme was implemented.); *United States v. TEVA Pharm. USA, Inc.*, No. 13 CIV. 3702 (CM), 2016 WL 750720, at *15 (S.D.N.Y. Feb. 22, 2016) ("Providing sample claim information for one program with respect to the drugs at issue is a sufficient basis for the Court to infer that similar claims were submitted to the other named government programs."). Courts have applied this

principle in cases involving allegations of inflated U&C charges. *See, e.g.*, *Schutte*, 218 F. Supp. 3d at 774 (relators "need not plead redundant examples for every State or Federal program that the Defendants defrauded"); *Proctor*, 2016 WL 7017231, at *10 (same); *Garbe I*, 968 F. Supp. 2d at 986 n.8 (sample claims from Ohio were sufficient to support allegations of nationwide U&C scheme where billing practices were allegedly directed from Kmart's corporate office).

Here, relator alleges that corporate management—individuals identified by name—implemented uniform pricing policies and practices for government payers in seven states by programming the chain's uniform billing and dispensing software to bill phony U&C charges to third-party payers. [FAC ¶¶ 75–93]. The FAC describes a uniform, chainwide scheme directed by headquarters. The FAC also describes communications relator allegedly had on April 5 and 6, 2013, with technicians at pharmacies in Arkansas, Mississippi, Oklahoma, and Tennessee, during which the technicians confirmed that their pharmacies continued to offer four-dollar generic pricing through the acquisition by Walgreens. [FAC ¶ 88]. Although the specific examples of false claims alleged in the FAC come from a single pharmacy, relator's factual allegations support a reasonable inference that false claims were submitted across the pharmacy chain.

## E. "Clustering" of Defendants

Defendants argue that relator fails to meet the requirements under Rule 9(b) because the FAC "improperly clusters and groups defendants without identifying which of the fifteen defendants allegedly submitted false claims or records and to whom." [Doc. 87, p. 18].

Where multiple defendants are involved, it is important that the complaint "make clear exactly *who* is alleged to have done *what* to *whom*, to provide each individual with fair notice as to the basis of the claims against him or her." *Brooks*, 305 F. Supp. 3d at 1292 (quoting *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011)). That said, "there is no reason to ban good, succinct prose when reviewing the allegations of conduct and omissions that the

defendants did collectively." *In re Thornburg Mortg., Inc. Sec. Litig.*, 695 F. Supp. 2d 1165, 1200 (D.N.M. 2010).

In *Schutte*, the court considered and rejected the same argument advanced by defendants here. 218 F. Supp. 3d at 771–72. In that case, the relators alleged a similar price-match scheme against a pharmacy chain, alleging that SuperValu,, Inc. operated or controlled "many different branded pharmacies, both individually and through its subsidiaries, affiliated and related organizations . . . ." *Id.* at 770. The defendants argued that the relators had "improperly clustered" the defendants by failing to allege specific claims against the multiple named defendants. *Id.* at 771. Based on the "allegations of a uniform, nationwide and fraudulent scheme facilitated through a shared centralized ARx pharmacy transaction system," the court concluded that the relators had provided the defendants with fair notice of their claims to the extent required by Rule 9(b). *Id.* at 772.

Similarly, here, relator alleges a uniform, chainwide scheme facilitated through a shared centralized pharmacy transaction system. According to relator, LaFrance Holdings, LaFrance Pharmacy, Stephen L. LaFrance, Jr. and Jason LaFrance owned and controlled a group of affiliated, corporate entities that, in turn, collectively owned "a chain of pharmacies that were operated and controlled as a single enterprise." [FAC ¶ 21]. The FAC spends nineteen paragraphs, spanning twelve pages, describing the relationships between the defendants. [FAC ¶¶ 18–37]. Relator alleges that, by the fall of 2008, management "began requiring *all* of the USA Drug pharmacies to offer the $4 generic pricing to any cash-paying customer who requested it." [FAC ¶ 77] (emphasis added). He also alleges that, between the fall of 2008 and the September 2012 acquisition by Walgreens, management supplied the pharmacies with a billing software program, which "established a single price for every drug that management characterized as the 'Usual &

Customary price.'"  [FAC ¶ 81].  That price "was determined by corporate headquarters."  [*Id.*].

Based on the detailed factual allegations in the FAC—including the chainwide, top-down nature

of alleged scheme—the court finds and concludes that relator has not improperly clustered

defendants and has provided fair notice of his claims to the extent required by Rule 9(b).

Certain defendants challenge the sufficiency of relator's allegations as to them specifically.

The court addresses these arguments below.

### 1. Claims against Walgreens

Walgreens argues that relator fails to allege any plausible violation of the FCA as to it in

particular.  [Doc. 87, pp. 29–32].  But Walgreens admits in its motion that it acquired six of the

named defendants—Super D Drugs Acquisition Co., May's Drug Stores, Inc., Jim Bain's

Pharmacy, Inc., S&W Pharmacy, Inc., Consolidated Stores, Inc., and Pharm-Mart Pharmacy of

Warren, Inc.—and that, as a result, those defendants "no longer exist as separate legal entities."

[Doc. 87, p. 8 n.1].  Relator plausibly argues that Walgreens assumed the liability of those entities.

Moreover, relator alleges that Walgreens knew of and continued to operate the price-match

program for several months post-acquisition, and that relator himself warned a Walgreens manager

that excluding the government from the four-dollar pricing violated the law.  [FAC ¶¶ 85–88, 100].

The FAC cites, among other things, 31 U.S.C. § 3729(a)(1)(G), sometimes called the

"reverse-false-claims" provision.  [FAC ¶ 107].  This provision "reverses the typical claim under

the False Claims Act: instead of creating liability for wrongfully *obtaining* money from the

government, the reverse-false-claims provision creates liability for wrongfully *avoiding* payments

that should have been made to the government."  *United States ex rel. Barrick v. Parker-Migliorini*

*Int'l, LLC*, 878 F.3d 1224, 1230 (10th Cir. 2017).  In relevant part, the provision imposes liability

on any person "who knowingly and improperly avoids or decreases an obligation to pay or transmit

money or property to the Government."  31 U.S.C. § 3729(a)(1)(G).  Congress defined

"obligation" to mean "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment . . . ." 31 U.S.C.A. § 3729(b)(3).

Relator has asserted, and defendants have not contested, that the Social Security Act imposes an affirmative duty on pharmacies to report and return any Medicare or Medicaid overpayments they identify within sixty days of discovery. [FAC ¶ 74] (citing 42 U.S.C. § 1320a-7k(d)). The statute also expressly states that the duty it imposes is an "obligation" as that term is used in section 3729(b)(3) of the FCA. 42 U.S.C. § 1320a-7k(d)(3). Relator plausibly alleges that Walgreens had notice that the price-match program was unlawful and failed to exercise reasonable diligence in investigating, reporting, and returning overpayments.

### 2. Claims against the Individual Defendants

The two individuals defendants—Stephen LaFrance, Jr. and Jason LaFrance—argue that relator fails to plead sufficient details concerning their roles in any alleged FCA violation. [Doc. 89, pp. 14–18]. In relevant part, the FCA imposes liability on any person who "knowingly presents, *or causes to be presented*, a false or fraudulent claim for payment" or "knowingly makes, uses, *or causes to be made or used*, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A)–(B) (emphasis added).

"Generally, mere knowledge of the submission of claims and knowledge of the falsity of those claims is insufficient to establish liability under the FCA." *Sikkenga*, 472 F.3d at 714. There must be "a sufficient nexus between the conduct of the party and the ultimate presentation of the false claim to support liability under the FCA." *Id.* The FCA does not impose liability on parties "who merely fail to prevent the fraudulent acts of others," but liability does attach to "affirmative acts" that "cause or assist the presentation of a fraudulent claim." *Id.* at 715 (reversing district

court's determination that relator failed to sufficiently allege a "causing to be presented" claim under the FCA).

According to the FAC, the two individual defendants are the sons of Stephen L. LaFrance, Sr., the founder and former chairman of LaFrance Holdings. [FAC ¶ 20]. Stephen L. LaFrance, Jr., was the secretary of LaFrance Holdings, as well as a member of the board of directors of the following companies that owned pharmacies doing business under the USA Drug name: LaFrance Pharmacy; Jarco Pharmacies, Inc.; Daleco, Inc.; Super D Drugs Acquisition Co.; and Jim Bain's Pharmacy, Inc. [FAC ¶ 36]. He was also the president of the following companies, which operated along with the foregoing entities as a single enterprise: Jarco Pharmacies, Inc.; Daleco, Inc.; Ellisville Drug Acquisition Co.; and Arcadia Valley Drug Co. [*Id.*].

Jason LaFrance was executive vice president at LaFrance Holdings, as well as a member of the board of directors at the following companies which owned pharmacies doing business under the USA Drug name: LaFrance Pharmacy; Jarco Pharmacies, Inc.; Super D Drugs Acquisition Co.; Arcadia Valley Drug Co.; May's Drug Store; Ellisville Drug Acquisition Co.; Jim Bain's Pharmacy, Inc.; and Mr. Discount Drugs of South Jackson, Inc. [FAC ¶ 37]. He was also the vice president of Jarco Pharmacies, Inc., Arcadia Valley Drug Co., Jim Bain's Pharmacy, Inc., and Mr. Discount Drugs of South Jackson, Inc. [*Id.*].

The FAC asserts that, in or about 2008, Stephen L. LaFrance, Jr., Jason LaFrance, and the entities "that they controlled and operated as a single enterprise that did business as 'USA Drug' . . . began requiring the USA Drug pharmacies to offer hundreds of generic medications to customers paying with cash rather than insurance" at four-dollar pricing. [FAC ¶ 75]. Relator alleges that he first learned that USA Drug planned to implement four-dollar generic pricing in conversations in 2008 with the two individual defendants, Stephen LaFrance, Jr. and Jason

LaFrance, and others. [FAC ¶¶ 96–97]. Upon learning of the implementation of four-dollar generic pricing for cash-paying customers but not for Medicaid, relator expressed his objections in communications with the individual defendants and others, noting that implementation of such pricing for cash customers without making the same pricing available for Medicaid would be illegal. [FAC ¶ 98].

Relator does more than merely allege that the individual defendants were in positions of authority at the time of the FCA violations. He plausibly alleges that the individuals defendants were directly involved in disseminating information about the price-match program and that they knew (or recklessly disregarded the fact) that the program would result in the presentment of false claims for payment from the government. The allegations in the FAC are therefore sufficient to state a claim against the individual defendants. Rule 9(b)'s purpose is to provide *fair notice* of plaintiff's claims and the factual ground upon which they are based. *See Polukoff*, 895 F.3d at 745. The allegations in the FAC achieve that purpose.

## VI. Conclusion

WHEREFORE, defendants' motions to dismiss [Doc. 87; Doc. 88] are denied.

IT IS SO ORDERED this 7th day of March, 2019.

GREGORY K. FRIZZELL, CHIEF JUDGE